974 A.2d 403

STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT,
v. ALONZO B. HILL, DEFENDANT–APPELLANT.

Argued January 20, 2009—Decided July 14, 2009.

546

*Susan Brody,* Assistant Deputy Public Defender, argued the cause for appellant (*Yvonne Smith Segars,* Public Defender, attorney).

*Hilary L. Brunell,* Assistant Prosecutor, argued the cause for respondent (*Paula T. Dow,* Essex County Prosecutor, attorney; *Sara A. Friedman,* Assistant Prosecutor, on the letter briefs).

*Mary E. McAnally*, Deputy Attorney General, argued the cause for *amicus curiae* Attorney General of New Jersey (*Anne Milgram*, Attorney General, attorney).

Justice LaVECCHIA delivered the opinion of the Court.

Defendant Alonzo Hill was convicted of first-degree robbery and related offenses for his role as an accomplice in a 2003 robbery of a Newark commercial establishment. According to the State's theory of the evidence, Hill was a knowing participant in the robbery even though he did not get out of the car in which he drove the other participants to Newark, he did not go inside the establishment, he did not touch the items that were taken, and he never held the gun that was used during the robbery. According to the State, Hill's knowledge of the planned robbery when he transported the perpetrators to Newark, as well as his assistance in the escape, rendered him an accomplice to the crimes committed by those conspirators. The jury heard differently from Hill, who claimed a lack of any prior knowledge about the robbery. He testified that his teenage nephew (N.G.) and two companions never said anything in his presence about an intended robbery when he drove them to Newark and, further, that he first saw the gun that was used in the robbery when one of the young men was holding it as he ran from the building in which the robbery had taken place, chased by a group of angry men.

In the jury's evaluation of the clashing evidence about Hill's mental state, the State received the benefit of a missing witness, or *Clawans*,[1] charge, which was delivered by the court over the defense's objection. The court instructed the jury that it could infer, based on Hill's failure to call his nephew as a witness, that the nephew's testimony would have been adverse to Hill's interests. We conclude that providing a *Clawans* charge in those circumstances constituted reversible error. The charge, which favored the State on an element of its required proofs, had the

---

[1] *State v. Clawans*, 38 *N.J.* 162, 183 A.2d 77 (1962).

inescapable effect of undermining defendant's entitlement to benefit from the presumption of innocence and to demand that the State bear the burden of proving, beyond a reasonable doubt, all elements of the charges against him. The prejudicial instructional error requires us to reverse and remand.

## I.

At trial, the State presented testimony from Sergio Romaneto, the manager of the kitchen/baking facility [2] that was robbed on the morning of July 3, 2003. Romaneto, the owner's nephew, was in a backroom office counting money when a man with a white t-shirt wrapped around his head and face entered the office. A surveillance video in the premises captured the robbery that ensued.

Romaneto, who speaks only Portuguese, did not understand the unarmed man's words but could tell from his pointing and gesturing that he wanted the money. Frightened, Romaneto threw a chair at him. A second man entered the office, armed with a black gun. He also had his face and head partially cloaked by a white t-shirt. The men made Romaneto move into the kitchen area, where other employees were kneeling on the floor. When the robbers were unable to open the safe located in the back office, one of them grabbed a laptop computer and its battery before running out of the building. In the meantime, Romaneto was mounting a defense. Out in the kitchen, he instructed the other employees to fight back because he believed that the robbers were using a toy gun.

Romaneto and the employees ran outside, chasing after the two men, screaming in Portuguese, "It's a robbery, it's a robbery." Romaneto saw the men remove the t-shirts from their heads and get into a dark blue or black car. Inside he saw a different man

---

[2] According to Romaneto, the facility supported several luncheonettes operating as Casa Do Pao. Some witnesses described the facility as a "central kitchen," others referred to it as a "bakery." The facility also housed an office area where administrative tasks were performed.

behind the wheel. At the trial, he identified the driver as Hill. Meanwhile, Romaneto's yelling about "a robbery" caused another car to turn and block the robbers' vehicle from departing. Accordingly, the robbers spilled out of the vehicle and a tussle ensued between them and Romaneto's determined employees. At one point, Romaneto was struck in the shoulder with the butt of the gun. The fighting ended when the armed man pointed the gun at Romaneto and his men. As the employees retreated, one of the men who had been inside the building got into the car and drove off. Of the two remaining, one ran away while the other larger man (identified later as Hill) began to walk away. Romaneto and his employees attempted to encircle Hill in order to detain him, but Hill gestured menacingly at them. Due to his obvious greater size, they let him leave the area. According to Hill's version of the facts, he continued walking until he was picked up by his nephew, N.G.

Romaneto, looking for help, flagged down a police car. He gave the officers a description of the car and its license plate number. The officers who testified for the State added the following evidence.

Canvassing the immediate vicinity, Officer Juan Vazquez of the Newark Police Department spotted a car matching Romaneto's description. As Vazquez approached, he saw N.G. and Hill get out of the car, with Hill emerging from the driver's seat and N.G. from the passenger's seat.[3] In the car, Vazquez saw a laptop computer fitting the description of the one that had been reported stolen. Vazquez and his partner arrested defendant and N.G. and brought them to Romaneto, who identified defendant as the driver seated in the waiting car and N.G. as one of the men who had entered the kitchen facility. Meanwhile, another officer responded to a report of a black handgun found in a garbage can two blocks from the kitchen facility. Although the handgun was

---

[3] Hill claimed that he was a passenger in the car. The State's witnesses claimed that they saw Hill emerge from the driver's seat.

secured, a fingerprint analysis failed to reveal either N.G.'s or Hill's fingerprints on it.

Hill's defense centered on his lack of knowledge of what N.G. and his companions planned to do at Casa Do Pao once he brought them there. The theme to Hill's defense was to raise reasonable doubt about the *mens rea* element necessary to support a guilty verdict based on accomplice liability for the robbery. Hill offered no dispute that on July 3, 2003, at approximately eleven o'clock in the morning, he drove his seventeen-year-old nephew and his nephew's friends, Omar and "T," from Brooklyn to the Casa Do Pao central kitchen/bakery facility.[4] Hill agreed to drive the three men when Omar offered him fifty dollars in exchange.

When Hill was taken to the police station, after being advised of his *Miranda*[5] rights, he gave a statement explaining Omar's offer to pay fifty dollars for Hill to drive him, T, and N.G. to the kitchen/bakery in Newark. Hill claimed that although he did not see which of the young men went into the building, all three left the car when they arrived. Hill waited in the car. A short while later, Hill saw Omar and N.G. emerge from the building, running toward the car, yelling for Hill to open the door. The car was not running. According to Hill, he walked away. N.G. drove off in the car. He admitted, however, that he later met up with N.G. and, after they had parked the car, the two were arrested by the police.

Hill was indicted for: second-degree conspiracy to commit armed robbery, *N.J.S.A.* 2C:5–2 (Count One); third-degree aggravated assault with a deadly weapon, *N.J.S.A.* 2C:12–1(b)(2) (Count Two); first-degree armed robbery, *N.J.S.A.* 2C:15–1 (Count Three); third-degree unlawful possession of a handgun without a

---

[4] Neither the State nor Hill can account for T's whereabouts after he got out of the car. There was no evidence adduced at trial indicating that he participated in the robbery or subsequent escape. As far as this record reveals, neither T nor Omar was arrested in connection with this incident.

[5] *Miranda v. Arizona*, 384 *U.S.* 436, 86 *S.Ct.* 1602, 16 *L.Ed.*2d 694 (1966).

permit, *N.J.S.A.* 2C:39–5(b) (Count Four); and second-degree possession of a handgun for the unlawful purpose of using it against the person or property of another, *N.J.S.A.* 2C:39–4(a) (Count Five).

At trial, Hill testified that the men involved in the robbery did not talk about it in his presence beforehand and he claimed to have had no idea that they were going to rob the establishment. According to Hill, on the drive from Brooklyn to Newark they talked only about the directions Hill needed in order to navigate the trip. Hill claimed never to have seen a gun until Omar emerged from the building, running with the gun in his hand.[6] When asked about his relationship with N.G., defendant stated that the two had been living together at the time the robbery took place, but that the last time he had seen his nephew was two months prior to the trial. He testified that he had not discussed the case with N.G., but was "pretty sure" that N.G. knew about Hill's trial because he was aware that N.G. was in touch with a relative in New Jersey. When pressed, Hill said that he believed that N.G. was married and living somewhere in Alabama.

Based on the questioning about N.G., during the jury charge conference the trial court asked the prosecutor if she was requesting a *Clawans* charge, explaining that the State had asked questions about N.G. that led the court to believe such a charge was desired. When the State responded affirmatively, the court asked for proof that the juvenile matter against N.G. had been concluded, stating that "if he hadn't been adjudicated, obviously I don't believe you can draw inferences from a person who has a charge pending failing to come forward."

---

[6] Hill had made a contrary incriminating statement to police, with which he was confronted on cross-examination during trial. At trial, he claimed to have been confused by the police officer's manner of questioning. Hill's testimony at trial also contradicted the officer's testimony that he emerged from the driver's seat of the car just prior to his arrest. Plainly, Hill's testimony portrayed himself as not involved in the escape, as well as unaware of the robbery prior to its happening in the Casa Do Pao.

That inquiry resulted in the following information being placed in the record. N.G. pleaded guilty as a juvenile on August 5, 2003, and was sentenced to two years of probation. His case was terminated on October 21, 2004. As he had agreed to do, at N.G.'s plea hearing he provided a factual recitation about Hill's involvement in the incident.

The trial court reviewed a transcript of N.G.'s plea colloquy and then placed on the record that it found that N.G. gave testimony concerning the "involvement of his uncle, [defendant,] whom he claimed ... knew about the plan in advance. As well as the intent to use weapons." N.G.'s plea agreement did not obligate him, however, to testify for the State during Hill's criminal trial.

With that information secured, the trial court stated that it was satisfied that "[N.G.] would not have been prejudiced if he was called in this proceeding." Moving forward on the *Clawans* charge request, the trial court offered defendant the opportunity to reopen the record to present N.G. as a witness or to demonstrate a reason for failing to call him. Defense counsel objected to the appropriateness of giving a *Clawans* charge in these circumstances, emphasizing that N.G. could not be produced for trial:

[DEFENSE COUNSEL]: Your Honor, we will not be able to call the witness. We do not know where he is located at this point in time.

When my client indicated the last he heard [from N.G.] he believed he was in Alabama. He has not lived with my client for some period of time. He got married in the interim apparently. This incident, it's occurred nearly two years ago now. And the last time he spoke to him, according to my client's testimony, was at best two months ago. And without knowing where he is[,] it would be very hard to produce him. Also the fact that he is in Alabama at this point in time would make it very difficult to produce him in a timely fashion before this court, even if we were to know his exact and precise location.

. . . .

THE COURT: Was there any effort made during the conversation two months ago to verify his address?

[DEFENSE COUNSEL]: During the pendency of this case, efforts were made to contact and interview [N.G.]. However, while he had pled, his case was not technically disposed of during the initial pendency of this case, which is why we were not permitted to speak to him at that point in time. And since then, as your Honor is aware with the history of this case, it has had numerous trial dates which very frequently in advance we knew it wasn't going.

. . . .

THE COURT: Unfortunately for your position, counsel, the court is in a unique position to be satisfied that had he been produced he would not have been favorable to you. Normally we're not in that position, but the official transcript of the [plea] and the testimony that he gave before the court is indicative of the fact that had he been called to testify, not only do we suspect it would not be favorable to you, it would not have been.... Normally in *Clawans* cases we can only infer that from certain facts, namely the general sense that the witness might have said something in support of your client's claim that he had no knowledge of the robbery before the fact. But unfortunately this witness has testified before a court of law and has given sworn testimony before a court of law to the exact opposite. So there's no question that his production would not have been of assistance to your client under these circumstances.

. . . .

[DEFENSE COUNSEL]: ... I did want to place on the record ... I did get a chance to obtain ... information from [defendant's] family. I believe his cousin who is here, who also is [N.G.'s] cousin ... [and] his uncle ... indicated that they do not know where [N.G.] is at this time and they do not believe they could get a location for him.

THE COURT: Are you asking to call the witness?

[DEFENSE COUNSEL]: I'm placing for the record that I don't believe that I can call this witness.

THE COURT: No, I'm asking are you asking to call a witness who can confirm your efforts to obtain the witness prior to trial and your inability to do so. Because the question is ... not what position you happen to be in as we speak, but what efforts you made prior to trial to have the witness available.

[DEFENSE COUNSEL]: Right. And no, your Honor, I'm not asking to do that.

The court determined that there were sufficient grounds to support a *Clawans* charge and stated the reasons supporting its decision.

THE COURT: Now, I am satisfied that the inference is strong here, primarily because we have available to us something that we would not normally have, namely the sworn testimony of this very witness exactly to the contrary of purportedly what you would call him to say....

I'm satisfied under these circumstances, based upon, first of all, his family relationship with the defendant, that he is a witness that is clearly uniquely within your control. Second of all, that if he were to testify consistently with what your client said, that clearly all other things being equal, would have been helpful to him and superior to his own testimony, particularly since he has acknowledged his own guilt of the offense. The only wrinkle that comes in is if he said the exact opposite of your client's knowledge of what was going on. The fact that as recently as two months ago he was spoken to and you have said nothing that leads me to believe that any effort was made whatsoever to either confirm his present location and/or

to attempt to obtain his production for the trial, I have heard nothing to the contrary that any effort has been made to do that. Obviously you cannot know that which you do not seek to know. So you cannot then turn around and use that as an excuse for non production.

And finally, no one has attempted to convince me that he was asked to come and refused to do so.

The court finds that the inference is appropriate in this case. The *Clawans* charge will be given and the prosecutor will be permitted to comment to that effect during her summation.

Accordingly, the court included the following *Clawans* charge in its instructions to the jury:

[D]uring the course of the trial reference has been made to [N.G.], the nephew of the defendant. He was talked about as one of the actors that . . . came over in the car on the date of this robbery. And as such he has been referred to as a person who may have information relevant to the matter before you.

And it's also pointed out to you that during the examination of Mr. Hill that the defendant has failed to call him to testify, particularly that he might be able to shed some light on the lack of knowledge that Mr. Hill had of the entire affair.

Now, the rule is that where a party fails to produce as a witness a person whom that party would naturally be expected to call to testify, you have a right to infer that had the witness been produced he would have testified adversely to the interest of the defendant.

The reason for this rule is that where you would normally expect a party to call a person as a witness and that party, without reasonable explanation fails to do so, it leaves a natural inference that the non-producing party fears exposure of facts which would be unfavorable to him.

Now, remember an inference is a deduction of fact that may logically and reasonably be drawn from another fact or group of facts established by the evidence. Whether or not any inferences should be drawn is for the jury to decide using your own common sense, knowledge and everyday experience. Ask yourselves is it probable, logical or reasonable. However, you are never required or compelled to draw an inference. You alone decide whether the facts and the circumstances shown by the evidence supports an inference and you are always free to draw or not draw an inference. If you draw an inference you should weigh it in connection with all the other evidence in the case, keeping in mind that the burden of proof is upon the State to prove all of the elements of the crime beyond a reasonable doubt.

The jury returned a guilty verdict against defendant on all charges.

At sentencing, the court found aggravating factors three, six and nine, no mitigating factors, and that the weight of the aggravating factors prevailed. *See N.J.S.A.* 2C:44–1. The court merged the convictions for conspiracy to commit robbery, aggra-

vated assault, and possession of a weapon for an unlawful purpose with the first-degree robbery conviction. The court imposed a seventeen-year period of incarceration, with an 85% period of parole ineligibility pursuant to the No Early Release Act, for the first-degree robbery conviction. *N.J.S.A.* 2C:43–7.2. A concurrent five-year term was imposed for the unlawful possession of a weapon conviction. The court also imposed a five-year period of parole supervision, as well as appropriate fines and penalties.

On appeal, Hill claimed that the trial court committed reversible error by giving a *Clawans* charge in this matter. He also argued that the trial court should have granted his motion for a judgment of acquittal on first-degree robbery because the victim, Romaneto, believed that the weapon was a toy gun; and that his sentence was excessive. In an unpublished opinion, the Appellate Division affirmed defendant's conviction and sentence.

The panel first addressed the issuance of a *Clawans* charge in this matter. In reviewing the circumstances under which a *Clawans* charge may be appropriate, the panel found that the trial court failed to assess properly whether N.G. was "available ... both practically and physically." Based on its review of the record, the panel concluded that defendant was "unaware of N.G.'s address or exact location." It also observed that the court should have taken into consideration N.G.'s "special relationship" with the State when deciding whether N.G. was "available" to the defense. Nevertheless, the panel concluded that "any error in giving the *Clawans* charge was harmless." [7]

We granted defendant's petition for certification. *State v. Hill,* 195 *N.J.* 520, 950 *A.*2d 907 (2008).

## II

It is well settled that due process requires the State to prove each element of a charged crime beyond a reasonable doubt.

---

[7] The panel also rejected defendant's argument that his motion for a judgment of acquittal should have been granted and that his sentence was excessive.

*See In re Winship*, 397 *U.S.* 358, 364, 90 *S.Ct.* 1068, 1072–73, 25 *L.Ed.2d* 368, 375 (1970) (applying Due Process Clause of Federal Constitution); *State v. Anderson*, 127 *N.J.* 191, 200–01, 603 *A.2d* 928 (1992) (requiring same under State Constitution). A defendant need not call any witnesses, choosing instead to rely on the presumption of innocence. *See Winship, supra*, 397 *U.S.* at 363, 90 *S.Ct.* at 1072, 25 *L.Ed.2d* at 375 (stating that "[t]he [reasonable-doubt] standard provides concrete substance for the presumption of innocence—that bedrock 'axiomatic and elementary' principle whose 'enforcement lies at the foundation of the administration of our criminal law' " (quoting *Coffin v. United States*, 156 *U.S.* 432, 453, 15 *S.Ct.* 394, 403, 39 *L.Ed.* 481, 491 (1895))). "This presumption is an instrument of proof created by the law in favor of one accused, whereby his innocence is established until sufficient evidence is introduced to overcome the proof which the law has created." *Coffin, supra*, 156 *U.S.* at 459, 15 *S.Ct.* at 405, 39 *L.Ed.* at 493. Simply put, the presumption of innocence and the State's beyond-a-reasonable-doubt proof requirement work hand-in-hand to protect an accused and force the State to satisfy the proof requirements for a conviction. *See Estelle v. Williams*, 425 *U.S.* 501, 503, 96 *S.Ct.* 1691, 1692, 48 *L.Ed.2d* 126, 130 (1976) ("[A]lthough not articulated in the Constitution, [the presumption] is a basic component of a fair trial under our system of criminal justice."). With those principles controlling the State's proof obligations in a criminal trial, we turn to a question about the use of an adverse inference against a criminal defendant arising from the defendant's failure to call a particular witness.

We first addressed a litigant's discussion of the "natural inference" that may arise from an adversary's failure to call a witness in *State v. Clawans*, 38 *N.J.* 162, 170, 183 *A.2d* 77 (1962). We set forth when it would be appropriate to allow one party to urge a jury to draw an adverse inference against an opposing party for the failure to call an available witness and, further, we concluded that it would be permissible for a trial court to instruct the jury on such an inference in both civil and criminal trial settings. *Id.* at

170–72, 183 *A*.2d 77. The specific setting that existed in *Clawans* bears repeating.

A witness had not been called by the State and the defendant asked the court to instruct the jury that it could infer from the State's failure to produce the witness that the witness's testimony would have been against the State's interest. *Id.* at 170, 183 *A*.2d 77. We began by elaborating on when such an inference properly may be drawn and, therefore, when the possibility of finding such an inference may be brought to the jury's attention:

> Generally, failure of a party to produce before a trial tribunal proof which, it appears, would serve to elucidate the facts in issue, raises a natural inference that the party so failing fears exposure of those facts would be unfavorable to him. But such an inference cannot arise except upon certain conditions and the inference is always open to destruction by explanation of circumstances which make some other hypothesis a more natural one than the party's fear of exposure. This principle applies to criminal as well as civil trials, to the State as well as to the accused.
>
> For an inference to be drawn from the nonproduction of a witness it must appear that the person was within the power of the party to produce and that his testimony would have been superior to that already utilized in respect to the fact to be proved.
>
> For obvious reasons the inference is not proper if the witness is for some reason unavailable or is either a person who by his position would be likely to be so prejudiced against the party that the latter could not be expected to obtain the unbiased truth from him, or a person whose testimony would be cumulative, unimportant or inferior to what had been already utilized. The failure to call a witness available to both parties has been said to preclude the raising of an inference against either. However, the more logical approach views this situation as posing a possible inference against both, the questions of the existence and strength of the inference against either being dependent upon the circumstances of the case, including whether one party has superior knowledge of the identity of the witness and what testimony might be expected from him, as well as the relationship of the witness to the parties.
>
> Application of the above principles is particularly perplexing and difficult where a litigant requests a charge to that effect.
>
> [*Id.* at 170–72, 183 *A*.2d 77 (internal citations omitted).]

█ Due to the need to have a court examine carefully the basis for such a charge, or for permitting a summation reference about the jury's drawing of an adverse inference for failure to call an available witness, we set a framework requiring prior notice. *Id.* at 172, 183 *A*.2d 77. The party seeking the jury charge must notify the opposing party and the judge, outside of the presence of

the jury, must state the name of the witness or witnesses not called, and must set forth the basis for the belief that the witness or witnesses have superior knowledge of relevant facts. *Ibid.* The procedure of prior notification is also required whenever a party wishes to mention the inference during closing argument. *See State v. Carter,* 91 *N.J.* 86, 128, 449 *A.*2d 1280 (1982); *see also Clawans, supra,* 38 *N.J.* at 172, 183 *A.*2d 77 ("Depending upon the particular circumstances ... the trial court may determine that the failure to call the witness raises no inference, or an unfavorable one, and hence whether any reference in the summation or a charge is warranted.").

The trial court's involvement in the process is critical. We rely on the court's dispassionate assessment of the circumstances to determine whether reference to an inference in summation is warranted and, further, whether a jury instruction should be injected into the mix of the parties' arguments, informing the jurors that they may draw such an inference from a party's failure to call a witness. *Clawans, supra,* 38 *N.J.* at 172, 183 *A.*2d 77. Care must be exercised because the inference is not invariably available whenever a party does not call a witness who has knowledge of relevant facts. *See State v. Velasquez,* 391 *N.J.Super.* 291, 306, 918 *A.*2d 45 (App.Div.2007); *see also Wild v. Roman,* 91 *N.J.Super.* 410, 415, 220 *A.*2d 711 (App.Div.1966) (prohibiting trial court from giving charge unless "satisfied that a sufficient foundation for drawing such an inference has been laid"). When making a determination about a *Clawans* charge, a court must demonstrate that it has taken into consideration all relevant circumstances by placing, on the record, findings on each of the following:

(1) that the uncalled witness is peculiarly within the control or power of only the one party, or that there is a special relationship between the party and the witness or the party has superior knowledge of the identity of the witness or of the testimony the witness might be expected to give; (2) that the witness is available to that party both practically and physically; (3) that the testimony of the uncalled witness will elucidate relevant and critical facts in issue [;] and (4) that such testimony appears to be superior to that already utilized in respect to the fact to be proven.

[*State v. Hickman,* 204 *N.J.Super.* 409, 414, 499 *A.*2d 231 (App.Div.1985), *certif. denied,* 103 *N.J.* 495, 511 *A.*2d 667 (1986).]

*See also State v. Irving,* 114 *N.J.* 427, 442, 555 *A.*2d 575 (1989) (recognizing importance of court's express consideration of all pertinent circumstances when reviewing prosecutor's request to mention inference in summation).

█ In short, trial courts must use caution because the consequences of error are severe if a *Clawans* charge is inappropriately provided: "[G]iving such a charge when it is not warranted ... may be prejudicial error ... [as] it is one thing for counsel in his summation to point to the absence of particular witnesses; it is quite another when the court puts the weight of its authority behind such a summation by telling the jury it may draw an adverse inference from their absence." *Wild, supra,* 91 *N.J.Super.* at 415, 220 *A.*2d 711. The prejudicial effect from an improper *Clawans* charge is exponentially higher for a criminal defendant.

## III.

### A.

Recently, in *Velasquez, supra,* a panel of our Appellate Division canvassed the perils associated with any use of a missing witness inference against a defendant in a criminal proceeding. 391 *N.J.Super.* at 307–08, 918 *A.*2d 45. In a scholarly review of the case law, Judge Grall, writing for the panel, reflected on the various reasons, unrelated to fear of the testimony that reasonably could explain a defendant's decision not to produce a witness for trial. *Ibid.* The panel emphasized that a court must evaluate the defendant's reasoning in choosing not to call a witness by considering "the person who is the witness, and the content of his or her expected testimony." *Id.* at 308, 918 *A.*2d 45 (internal quotation marks omitted). The witness's testimony may have been cumulative, or not helpful, or the witness may have asserted a privilege or bias preventing the testimony altogether. *Ibid.* In many instances it may be more reasonable to infer that the missing witness's testimony was unnecessary, not that the testimony was

potentially unfavorable or adverse to the defendant, a situation that may arise even more frequently in a criminal trial because "it is reasonable to infer that the defendant's decision to do without a witness can be explained by the defendant's reliance on the presumption of innocence." *Id.* at 309, 918 *A.2d* 45. The panel concluded, therefore, that the inference is improper whenever a defendant's decision to forego calling a witness can be explained by the defendant's reliance on the presumption of innocence. *Ibid.*

The *Velasquez* decision appropriately recognizes that the "missing witness" inference, which our case law allows, must not be used to circumvent the State's burden of proof or to undermine the defendant's presumption of innocence. The beyond-a-reasonable-doubt standard cannot be dispensed with, or its burden eased, because it serves to "impress[ ] on the trier of fact the necessity of reaching a subjective state of certitude of the facts in issue." *Winship, supra,* 397 *U.S.* at 363–64, 90 *S.Ct.* at 1072–73, 25 *L.Ed.*2d at 375. That "bedrock" principle curtails use of an adverse inference as against a criminal defendant for failure to call an available witness and, moreover, raises a serious concern about whether a jury charge about the inference should ever issue against a criminal defendant. The force of an instruction about an inference can be overwhelming to a jury wading through conflicting evidence about an element of a crime or clashing versions of why a defendant was present at a crime scene, even though the jury also is instructed that the State bears the burden to prove every element beyond a reasonable doubt.

Indeed, the validity of the use of the missing witness charge against a criminal defendant has been subject to legitimate question. The *Velasquez* panel, when commenting on the use of any inference against a defendant in criminal settings, noted a changing tide in this area of the law:

On a variety of grounds—diminished need for the inference in light of modern discovery practices and evidence rules that permit a party to impeach his or her own witness; the multitude of reasons for declining to call a witness; the potential to give undeserved significance to the missing witness and unwarranted weight to

evidence presented; potential for abuse and gamesmanship, and the complexity of the questions—scholars have questioned the continued validity and utility of the inference.

[*Velasquez*, supra, 391 *N.J.Super.* at 307 n. 1, 918 *A.2d* 45.]

And, although a majority of states continue to allow the inference, several have restricted use of the "missing witness" charge as against a criminal defendant. *See, e.g., State v. Malave*, 250 *Conn.* 722, 737 *A.2d* 442, 452 (1999) (abandoning missing witness charge in criminal cases for fear that it would "tip the scales against the party," but continuing to allow counsel to argue for inference in summation); *Russell v. Commonwealth*, 216 *Va.* 833, 223 *S.E.2d* 877, 879 (1976) (holding that instruction against criminal defendant would "weaken, if not neutralize, the presumption of innocence which, if given its full strength, might be sufficient to tip the scales in favor of acquittal"); *State v. James*, 211 *W.Va.* 132, 563 *S.E.2d* 797, 800–02 (2002) (indicating agreement with *Russell* ). Other jurisdictions have devised alternate limits on the use of a missing witness inference against a criminal defendant. *See, e.g., Jackson v. State*, 575 *So.2d* 181, 188 (Fla.1991) (allowing, pursuant to narrow exception, prosecutor comment on defendant's failure to produce witness when "defendant voluntarily assumes some burden of proof by asserting defenses of alibi, self-defense and defense of others"); *State v. Brewer*, 505 *A.2d* 774, 777 (Me.1985) (noting that "[t]o allow the missing-witness inference in a criminal case is particularly inappropriate since it distorts the allocation of the burden of proving the defendant's guilt"); *State v. Kelly*, 113 *N.H.* 222, 306 *A.2d* 58, 59 (1973) (stating that only when defendant injects alibi defense is failure to call witness with knowledge of defendant's whereabouts proper subject for comment by state); *State v. Montgomery*, 163 *Wash.2d* 577, 183 *P.3d* 267, 278 (2008) (noting limitations on missing witness doctrine as applied against criminal defendant, finding doctrine inapplicable when it infringes defendant's right to silence or would shift burden of proof).

In this state, we have twice reviewed and found no reversible error in a prosecutor's summation urging the jury to draw an inference from a criminal defendant's failure to call a witness. *See*

*State v. Wilson,* 128 *N.J.* 233, 243–45, 607 *A.*2d 1289 (1992); *Irving, supra,* 114 *N.J.* at 442–44, 555 *A.*2d 575. The factual situations in those appeals differed from that which is presented in this matter. In *Irving, supra,* the defendant advanced an alibi and, therefore, having put in issue the factual basis of that asserted defense, it was reasonable to urge the jury to infer that the defendant would have placed the available witness on the stand to support his claim of alibi. 114 *N.J.* at 444, 555 *A.*2d 575; *see also State v. Driker,* 214 *N.J.Super.* 467, 471–72, 519 *A.*2d 942 (App.Div.1987) (finding no impropriety in prosecution's reference in summation to defendant's failure to call either of two witnesses to corroborate asserted alibi defense). *Wilson, supra,* involved a different application of the missing witness inference in that the defendant's testimony had injected additional facts that he claimed affected the circumstances of the crime. 128 *N.J.* at 243, 607 *A.*2d 1289. Although the prosecutor failed to follow the notice and approval process prior to commenting on the missing witnesses, we did not find prejudicial error in the State's summation that urged the jury to draw an adverse inference against the defendant for failing to call two witnesses to support his version of what had transpired between him and the victim prior to the crime incident. *Id.* at 244–45, 607 *A.*2d 1289. Importantly, in neither *Irving* nor *Wilson* did we confront whether a *Clawans* charge should be given in a criminal trial when the charge would favor the State in a factual dispute over an element of the crime on which the State clearly bears the burden of proof.

We have not yet addressed the merits of a claim of error based on a *Clawans* charge against a criminal defendant. We note, however, that courts in our state have concluded that use of a *Clawans* charge against a defendant in a criminal trial did not constitute error. *See State v. Gonzalez,* 318 *N.J.Super.* 527, 529, 723 *A.*2d 1278 (App.Div.), certif. denied, 161 *N.J.* 148, 735 *A.*2d 573 (1999) (holding that trial court did not err in giving *Clawans* charge against defendant raising alibi defense); *State v. Powell,* 218 *N.J.Super.* 444, 448, 528 *A.*2d 39 (App.Div.1987) (affirming

trial court's decision to give *Clawans* charge).[8] We now hold that *Clawans* charges generally should not issue against criminal defendants. The inclusion in a criminal trial of a *Clawans* charge from the court risks improperly assisting the State in its obligation to prove each and every element of a charged crime beyond a reasonable doubt. It is difficult to foresee a situation where a *Clawans* charge might play a proper role in a case against a criminal defendant. Indeed, any reference to a negative inference against a criminal defendant must be carefully scrutinized to ensure that the comment does not mislead or have the capacity to confuse the jury into believing that a defendant had an obligation to produce the witness and the substantive evidence that the witness would have provided. Although we will not engage in hypothetical discussions of possible situations in which a negative inference might be argued to arise, suffice it to say that it would

---

[8] In *Gonzalez, supra,* the defendant had testified at trial that he was not at the scene of the crime, but was instead on a nearby street corner talking to friends, thereby recanting prior statements to the police in which he had admitted involvement in the crime. 318 *N.J.Super.* at 532, 723 *A.*2d 1278. Although the panel did not find the *Clawans* charge improper in those circumstances, it remanded for a new trial based on other instructional error. *Id.* at 536, 723 *A.*2d 1278. Our denial of certification in that matter therefore did not involve review of the use of the *Clawans* charge in the context of the newly raised alibi defense. 161 *N.J.* 148, 735 *A.*2d 573 (1999).

In *Powell, supra,* the Appellate Division also held that the trial court did not err in giving a *Clawans* charge against the defendant for failure to call a witness. 218 *N.J.Super.* at 448, 528 *A.*2d 39. The defendant had been arrested at the scene of a burglary. *Id.* at 447, 528 *A.*2d 39. At trial, he testified that he and a friend had stopped at the building, pulled their car around the back, and then his friend left, preventing the defendant from knowing where his friend went or what he did. *Ibid.* Defendant previously had not mentioned this person to the arresting officers at the scene of the burglary, or anytime during discovery. *Id.* at 448, 528 *A.*2d 39. Although at trial defense counsel provided the State with the friend's address, the State was unable to determine his whereabouts. *Ibid.* The Appellate Division concluded that that the *Clawans* charge was not inappropriate because defendant had introduced the involvement of this "friend" for the first time during his trial testimony, and the trial court had found the existence of a special relationship between defendant and the missing witness based upon defense counsel's specific acknowledgement of the friendship and of the witness's availability. *Id.* at 448–49, 528 *A.*2d 39.

be the rare case, if any, that would warrant a *Clawans* charge from the court. The instant matter exemplifies why, in the main, a *Clawans* charge has no proper place being used against a criminal defendant. The trial centered on a factual dispute between the State and Hill over an element of the crime, namely whether the State could prove that Hill had the requisite *mens rea* to be convicted of robbery.

## B.

The State's case against Hill was based on a theory of accomplice liability. A person is guilty of an offense if it is committed "by the conduct of another person for which he is legally accountable." *State v. White*, 98 *N.J.* 122, 129, 484 *A.*2d 691 (1984); *N.J.S.A.* 2C:2–6(a). One is legally accountable for another when that person acts as an accomplice. *N.J.S.A.* 2C:2–6(b)(3). A person is an accomplice of another when:

[w]ith the purpose of promoting or facilitating the commission of the offense; he

(a) Solicits such other person to commit it;

(b) Aids or agrees or attempts to aid such other person in planning or committing it; or

(c) Having a legal duty to prevent the commission of the offense, fails to make proper effort so to do.

[*N.J.S.A.* 2C:2–6(c)(1).]

To be an accomplice, a person must act with "the purpose of promoting or facilitating the commission of the substantive offense for which he is charged as an accomplice." *White, supra,* 98 *N.J.* at 129, 484 *A.*2d 691. In order for a defendant to be convicted of a crime premised upon accomplice liability, he must be shown to have shared the same criminal intent to commit the substantive offense as the principal. *Ibid.; see also State v. Fair*, 45 *N.J.* 77, 95, 211 *A.*2d 359 (1965) (holding that for both accomplice and partner to be found guilty, "it is essential that they shared in the intent which is the crime's basic element"). Moreover, all participants in the crime may be guilty, but not necessarily of the same degree. *White, supra,* 98 *N.J.* at 129, 484 *A.*2d 691. "If both parties enter into the commission of the crime with the same

intent and purpose each will be guilty to the same degree; but each may participate in the criminal act with a different intent." *Fair, supra,* 45 *N.J.* at 95, 211 *A.*2d 359. Thus, each defendant may "be guilty of a higher or lower degree of crime than the other, [and] the degree of guilt [will] depend[ ] entirely upon his own actions, intent and state of mind." *Ibid.; White, supra,* 98 *N.J.* at 131, 484 *A.*2d 691 (stating, for example, that "[i]t is possible for an accomplice to be guilty of robbery and for his compatriot to be guilty of armed robbery").

 Here the State had the burden of proving beyond a reasonable doubt that Hill had the requisite knowledge and intent in order to be found guilty of the armed robbery and related offenses based on its accomplice liability theory. Defendant did not need to prove anything; he could merely rely on the presumption of innocence and require that the State satisfy its burden. His claim that he did not know what N.G., Omar, and T were up to (concerning the robbery) was consistent with his claim of innocence.

When the trial court asked the prosecutor whether the State was requesting a *Clawans* charge based on defense counsel's failure to call N.G. as a witness, defense counsel immediately objected, arguing that N.G. could not be produced for trial. Ultimately, the trial court rejected defendant's arguments and gave the charge, instructing the jury that it could draw an adverse inference from defendant's failure to call N.G. The *Clawans* charge impermissibly allowed the jury to believe that defendant had a responsibility to call N.G. and that Hill bore some burden to prove that he had an innocent state of mind.

Faced with the prospect of a *Clawans* charge to the jury, Hill's choices were either to try to call N.G. and risk that N.G. might testify against him, or to not call N.G. and receive the adverse inference when it was the State's exclusive burden to prove, beyond a reasonable doubt, that Hill acted purposely as an accomplice to the robbery. Forcing a defendant, who is entitled to rely on the presumption of innocence, to make that choice was

improper in the context of the factual dispute over Hill's *mens rea*. In this case, the charge had the effect of injecting the court into that factual dispute and could have resulted in a lessening of the State's burden of proof on that element merely because Hill did not present an additional witness to contest the State's evidence in support of his guilt.

[18, 19] It may be one thing for the State to argue for an adverse inference when a defendant has voluntarily asserted some proof to create an affirmative defense, *see N.J.S.A.* 2C:3-4(a) (self-defense or defense of others); *State v. Williams,* 168 *N.J.* 323, 334, 774 *A.2d* 457 (2001), or asserts new facts about an alibi in defense, *see Irving, supra,* 114 *N.J.* at 442-43, 555 *A.2d* 575, but we do not address such circumstances here.[9] It is quite another thing for the jury to hear a court charge buttressing the State's argument that Hill knowingly participated in the robbery by telling the jury that it may draw an adverse inference against Hill and his claim of innocent intent because he did not call N.G. to corroborate his assertion. *See Wild, supra,* 91 *N.J.Super.* at 415, 220 *A.2d* 711 (recognizing compounding effect that comes from judicial imprimatur to inference from *Clawans* charge). We conclude that Hill should not have been forced into the Catch-22 that he faced in his trial below: either to call N.G., or else submit to a jury charge where the court informed the jury that it may find an adverse inference against Hill for failure to call N.G. The State must prove its own case and that burden may not be permitted to be lessened in the least through a *Clawans* charge. We hold

---

[9] Because this case does not involve a prosecutor's comments in summation, there is no warrant for us to address in detail any potential limits thereon. Suffice it to say that prosecutorial comment that improperly relieves the State of its obligation to prove each and every element of a charged crime beyond a reasonable doubt or suggests some obligation on the part of defendant to prove his innocence would suffer the same infirmity as an instruction to that effect. That said, we recognize that not all summation comment on a defendant's failure to produce a witness would produce the impermissible effect of lessening the State's burden of proof. We make that observation without meaning to suggest that prosecutorial comment would be appropriate in this case on retrial.

therefore that it was error for the trial court to charge the jury that defendant's failure to call N.G. as a witness could produce an adverse inference against defendant.

Moreover, we are unable to view the trial court's allowance of a *Clawans* charge as harmless error. It was prejudicial to defendant and was clearly capable of producing an unjust result. A charge from the court to the jury on a witness missing from defendant's presentation was too powerful to be injected into the factual clash over the *mens rea* element in issue at this trial. Due to this error, defendant's convictions must be reversed.

## IV.

The judgment of the Appellate Division is reversed and the matter remanded for a new trial.[10]

*For reversal and remandment*—Chief Justice RABNER and Justices LONG, LaVECCHIA, ALBIN, WALLACE, RIVERA-SOTO and HOENS—7.

*Opposed*—None.

---

[10] In reversing and remanding, we note our agreement with the Appellate Division's rejection of defendant's argument that he should have been granted a judgment of acquittal on the first-degree robbery charge. Defendant argued below that the State failed to prove, beyond a reasonable doubt, that the gun used was a deadly weapon because Romaneto believed that the weapon was a toy gun. The Appellate Division rightfully rejected that argument, finding that it "ignores the plain meaning of the statute, which states that robbery shall be a crime of the first-degree where the actor uses or threatens immediate use of an actual deadly weapon *or* where the victim reasonably believes the weapon is deadly." *See N.J.S.A.* 2C:15–1(b); *N.J.S.A.* 2C:11–1(c). Defendant himself identified the gun used in the robbery and stipulated that it qualified as an operable firearm. Thus, as the Appellate Division concluded, based on the State's evidence, the jury reasonably could have found that defendant used a deadly weapon and therefore was guilty of first-degree robbery.