**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-4302-18T3

IN THE MATTER OF
ANTHONY VILLANUEVA,
CITY OF TRENTON
POLICE DEPARTMENT.

_____

Submitted January 12, 2021 – Decided January 28, 2021

Before Judges Haas, Mawla, and Natali.

On appeal from the New Jersey Civil Service Commission, Docket No. 2019-74.

Katz & Dougherty, LLC, attorneys for appellant Anthony Villanueva (George T. Dougherty, on the briefs).

Trimboli & Prusinowski, LLC, attorneys for respondent City of Trenton (Stephen E. Trimboli, of counsel and on the brief; John P. Harrington, on the brief).

Gurbir S. Grewal, Attorney General, attorney for respondent Civil Service Commission (Sookie Bae, Assistant Attorney General, of counsel; Beau C. Wilson, Deputy Attorney General, on the statement in lieu of brief).

PER CURIAM

Appellant Anthony Villanueva appeals from the May 9, 2019 final administrative decision of the Civil Service Commission (Commission) removing him from his position as a police officer with the City of Trenton (City). The Commission adopted the findings of fact and conclusions of law from the initial decision of Administrative Law Judge (ALJ) Jeff S. Masin, who found that removal was warranted due to Villanueva's improper use of force against a detainee and his subsequent filing of a false report concerning that incident. We affirm.

The procedural history and facts of this case are fully set forth in ALJ Masin's April 5, 2019 initial decision following a multi-day hearing. Therefore, we need only briefly summarize them here.

On November 28, 2017, Villanueva was on duty at the Trenton Police Department Detention Center. He was assisted that night by a police aide (the aide).

Q.S. was one of the detainees that evening. Q.S. asked to make a telephone call, and Villanueva took him to the phone room and permitted him to do so. Q.S. did not end his call in a timely manner and Villanueva hung up the receiver. Q.S. responded by slapping Villanueva's hand or arm. Surveillance video in the area of the phone room confirmed this incident.

At that point, the aide joined Villanueva and the two men attempted to escort Q.S. from the phone room. As they did so, Q.S. elbowed Villanueva in his side. There is no surveillance video of the elbowing incident because there were no cameras in the hallway where it occurred. Villanueva stated he intended to charge Q.S. with assault on a police officer, which required that Q.S. be arrested and re-processed.

Villanueva filed a written report later that night setting forth his account of what happened next. According to Villanueva, he and the aide had "a long struggle" with Q.S. and were eventually able to get him into a cell. Q.S. "began to scream and cause a disturbance, which allegedly caused other prisoners to become irate as well." Villanueva asserted he told the aide to open the cell door[1] so he could handcuff Q.S. and complete the arrest process. Villanueva ordered Q.S. to get on the ground and told him that if he did not comply, Villanueva would spray him with OC spray.[2]

Villanueva claimed that as the aide began to open the cell door, Q.S. cleared his throat and looked like he was going to spit at him. Villanueva wrote

---

[1] The cell doors were opened and closed remotely through a control panel.

[2] OC spray is the common name for "Oleoresin Capsicum spray," which is also known as pepper spray.

A-4302-18T3

that he then grabbed the OC spray and attempted to spray Q.S. However, Q.S. shielded himself with a mattress and the spray was ineffective. Villanueva alleged he sprayed Q.S. a second time and the detainee "became extremely irate and exited his cell at which time he pushed [Villanueva] and ran toward the main detention hallway." After another "long struggle," Villanueva instructed the aide to call for additional officers for assistance. The officers were then able to subdue Q.S.

As ALJ Masin found, Villanueva's account of the incident was false. The episode was captured on a number of surveillance cameras and these video recordings[3] were introduced in evidence at the hearing.

The recordings showed that contrary to Villanueva's claims, he and the aide did not engage in "a long struggle" with Q.S. before finally being able to get him into a cell. Instead, the recording showed Q.S. "strolling" unaccompanied down the hall leading to the detention cells. Q.S. headed for an open cell door, which he entered. The cell door then began to close.

When the door was almost shut, the recording showed Villanueva coming down the hall with a can of OC spray already in his hand. At that point, Villanueva raised his arm toward the cell door and he began to shake the can.

---

[3] There were no audio recordings of any of the incidents.

A-4302-18T3

Villanueva then sprayed Q.S. with the OC spray. The recording showed that the cell door was almost fully closed at that time. After being sprayed, Q.S. picked up the mattress in his cell and attempted to shield himself. Villanueva then sprayed Q.S. twice more.

Villanueva left the area for a moment, but then returned and gestured as if to spray Q.S. again. However, the officer did not do so.

The recording showed that the cell door was later opened, and Q.S. exited the cell holding the mattress. As ALJ Masin stated in his decision, Q.S. then became "physically resistant and after a short time struggling with him, Officer Villanueva and [the aide were] joined by two other officers summoned from the first floor, who successfully subdue[d] Q.S."

After reviewing the video recordings, the Trenton Police Department (Department) charged Villanueva with conduct unbecoming a public employee, N.J.A.C. 4A:2-2.3(a)(6), and misconduct, N.J.S.A. 40A:14-147, based on his use of "mechanical force by issuing/spraying a chemical or natural agent . . . against a [detainee] while the [detainee] was secured in a detention unit cell." The Department later revised the disciplinary notice to add charges for, among other things, the submission of a false report.

The Department alleged at the hearing that Villanueva's use of OC spray against Q.S. violated the Attorney General's Use of Force Policy (UF Policy). The UF Policy states:

> In determining to use force, the law enforcement officer shall be guided by the principle that the degree of force employed in any situation should be only that reasonably necessary. Law enforcement officers should exhaust all other reasonable means before resorting to the use of force. It is the policy of the State of New Jersey that law enforcement officers will use only that force which is objectively reasonable and necessary.

The UF Policy further prescribes when physical or mechanical force[4] may be used:

> A law enforcement officer may use physical force or mechanical force when the officer reasonably believes it is immediately necessary at the time:
>
> a.     to overcome resistance directed at the officer or others; or
>
> b.     to protect the officer, or a third party, from unlawful force; or
>
> c.     to protect property; or

---

[4] "Mechanical force" is defined in the UF Policy as "the use of some device or substance, other than a firearm, to overcome a subject's resistance to the exertion of the law enforcement officer's authority." The UF Policy states that an example of mechanical force is "the use of a . . . chemical or natural agent spraying."

A-4302-18T3

d. to effect other lawful objectives, such as to make an arrest.

According to educational materials used when Villanueva received his new recruit training at the Mercer County Police Academy in 2014, police officers were instructed that OC spray "should not be used against, or in the immediate vicinity of . . . individuals in custody or in restraining devices unless an officer or another person is under attack."  (Emphasis in original).

At the hearing, Villanueva's superiors testified that Villanueva's use of the OC spray against Q.S. violated his training and the UF Policy because Q.S. was confined in a cell when the spray was administered.  At the time Villanueva deployed the mechanical force, Q.S. was not a threat to Villanueva, the aide, or other inmates.  At that point, Q.S. was not actively resisting the officers and, in fact, had entered the cell on his own volition.

To the extent that any of Q.S.'s actions upset the other detainees, they were also isolated in closed cells and therefore posed no danger to the officers.  The superior officers also testified that although Villanueva had grounds for arresting Q.S. on the new charge of assault on a police officer, there was no need for Villanueva to immediately fingerprint or photograph the detainee because Q.S. was already in custody.  Therefore, the City's officers opined that

7

Villanueva should have let the situation deescalate and under no circumstances should he have used OC spray against a detainee in a closed cell.

Villanueva and his two experts claimed that he was justified in using mechanical force against Q.S. because the detainee was resisting his orders to get on the ground so he could be arrested and processed for the new charge of assault on a police officer. However, Villanueva's expert's testimony was based, at least in part, upon Villanueva's faulty account of what transpired during the incident.

Although Villanueva complained that he was tired when he prepared his written report after the end of his shift and did not have the opportunity to review the surveillance videos before doing so, he admitted he had ample time to complete the report and did not rush to do so. Villanueva claimed he later told one of his supervisors, Sergeant Miguel Acosta, and another officer, Officer Jaydeen Smith, that there were a few things in his written report that were inconsistent with the surveillance recordings. Villanueva asserted that Sergeant Acosta was satisfied with this explanation and did not direct him to file a corrected report. Sergeant Acosta testified he did not recall discussing the videos with Villanueva and Officer Smith.

 A-4302-18T3

In his forty-page written decision, ALJ Masin found that Villanueva's report was deliberately false and was "written with the intention to cover up the facts about his initial use of OC spray, which he no doubt realized might appear to have been an inappropriate use of force in the circumstances." The ALJ noted that "as the recordings show, the officer had nothing physically to do with Q.S.'s movement to and entrance into" the cell. There was no "long struggle" as reported by Villanueva. Further, as soon as Villanueva arrived at the cell, he immediately administered the OC spray.

The ALJ found that:

> There is absolutely no indication that once [Villanueva] reached the cell he took any time whatsoever to warn Q.S., to take any steps to verbally calm him down, or to do anything other than to immediately spray OC at him. Any statement in the report that was intended to describe anything other than Villanueva's immediate resort to OC spray is at best misleading. Any suggestion that he was not already preparing to use the spray when he was not yet even up to the cell is also at best misleading, as he had it in his hand when he was approximately five cells away from [the cell]. And the spraying did not first occur only after [the aide] was opening the door. Instead, it occurred as the door was closing, in fact just before it was entirely closed.

ALJ Masin found that "the tenor of the description" in Villanueva's report "entirely hides the fact that his immediate reaction to the situation presented by Q.S.'s elbowing him, moving to [the cell] and entering it was to pull out the

9

spray and to use it at the very second that he arrived at the cell door." The ALJ rejected Villanueva's explanation that the misinformation in his report was due to fatigue and an inability to review the video recordings before writing the report. The ALJ concluded:

> It is much more reasonable to understand that Officer Villanueva was quite upset that Q.S. had defied him, had slapped him and elbowed him and had continued to defy him by refusing the direction to get on the ground after he elbowed the officer. He went to the cell armed with the spray can, which was, as he proceeded, not simply at his side on whatever secures it to his body in the normal course of business, but with the can in hand, ready for immediate use. When he wrote his report, he knew what had happened, and he did not want to tell his superiors that he had utilized the mechanical force as an almost instantaneous reaction to the conduct of the by then contained detainee.

ALJ Masin also concluded that Villanueva's use of force violated the UF Policy and his training. He found that Villanueva administered OC spray "into an effectively closed cell, in which the detainee was confined and effectively restrained." Further, "[a]t the time, there was no ability of Q.S. to cause harm to Officer Villanueva, other detainees, employees of the facility, or any reason to believe that he posed a danger to himself, or to property." The ALJ found that there was no immediate need to complete the processing steps for Q.S.'s re-arrest. When Villanueva arrived at the cell "and instantaneously sprayed at Q.S.,

10

there was no immediate need, no emergent circumstance, no reasonable justification for the use of OC spray."

The ALJ also found that Villanueva's motive for using the OC spray was "to retaliate against Q.S. for his physical defiance and assault." He dismissed Villanueva's claim of wanting to complete the re-arrest of Q.S., finding that the re-arrest "was not [Villanueva's] primary thought at the time, although it may have served as a convenient excuse later on."

Finally, ALJ Masin determined that Villanueva's "unsanctioned use of force [was] of a seriousness so as to indicate the inability of the officer to properly perform his police function." The ALJ concluded that the filing of a false report "compound[ed] the offense and . . . necessitate[d] [Villanueva's] removal." The Commission thereafter adopted ALJ Masin's initial decision as its final administrative decision and affirmed Villanueva's termination from employment. This appeal followed.

On appeal, Villanueva argues that: (1) the ALJ and the Commission erred by finding that he violated the UF Policy; (2) the Department failed to conduct an adequate investigation before terminating his employment; (3) the ALJ erred by not granting his request for an adverse inference against the City that his original false report was promptly corrected to the satisfaction of his sergeant;

A-4302-18T3

and (4) the Commission erred by adopting the ALJ's initial decision without addressing his exceptions to the ALJ's findings.

Established precedents guide our task on appeal. Our scope of review of an administrative agency's final determination is limited. In re Herrmann, 192 N.J. 19, 27 (2007). "[A] 'strong presumption of reasonableness attaches'" to the agency's decision. In re Carroll, 339 N.J. Super. 429, 437 (App. Div. 2001) (quoting In re Vey, 272 N.J. Super. 199, 205 (App. Div. 1993)). Additionally, we give "due regard to the opportunity of the one who heard the witnesses to judge . . . their credibility." In re Taylor, 158 N.J. 644, 656 (1999) (quoting Close v. Kordulak Bros., 44 N.J. 589, 599 (1965)).

The burden is upon the appellant to demonstrate grounds for reversal. McGowan v. N.J. State Parole Bd., 347 N.J. Super. 544, 563 (App. Div. 2002); see also Bowden v. Bayside State Prison, 268 N.J. Super. 301, 304 (App. Div. 1993) (holding that "[t]he burden of showing the agency's action was arbitrary, unreasonable[,] or capricious rests upon the appellant"). To that end, we will "not disturb an administrative agency's determinations or findings unless there is a clear showing that (1) the agency did not follow the law; (2) the decision was arbitrary, capricious, or unreasonable; or (3) the decision was not supported

by substantial evidence."  In re Application of Virtua-West Jersey Hosp. Voorhees for a Certificate of Need, 194 N.J. 413, 422 (2008).

When an agency decision satisfies such criteria, we accord substantial deference to the agency's fact-finding and legal conclusions, acknowledging "the agency's 'expertise and superior knowledge of a particular field.'"  Circus Liquors, Inc. v. Governing Body of Middletown Twp., 199 N.J. 1, 10 (2009) (quoting Greenwood v. State Police Training Ctr., 127 N.J. 500, 513 (1992)).  It is not our place to second-guess or substitute our judgment for that of the agency and, therefore, we do not "engage in an independent assessment of the evidence as if [we were] the court of first instance."  Taylor, 158 N.J. at 656 (quoting State v. Locurto, 157 N.J. 463, 471 (1999)).

In addition, we give "due regard to the opportunity of the one who heard the witnesses to judge . . . their credibility," and therefore accept their findings of fact "when supported by adequate, substantial and credible evidence."  Ibid. With regard to expert witnesses, we rely upon the trier of fact's "acceptance of the credibility of the expert's testimony and [the judge's] fact-findings based thereon, noting that the [judge] is better positioned to evaluate the witness' credibility, qualifications, and the weight to be accorded [to his or] her

testimony." In re Guardianship of D.M.H., 161 N.J. 365, 382 (1999) (citing Bonnco Petrol, Inc. v. Epstein, 115 N.J. 599, 607 (1989)).

Our deference to agency decisions "applies to the review of disciplinary sanctions as well." Herrmann, 192 N.J. at 28. "In light of the deference owed to such determinations, when reviewing administrative sanctions, 'the test . . . is whether such punishment is so disproportionate to the offense, in light of all the circumstances, as to be shocking to one's sense of fairness.'" Id. at 28-29 (alteration in original) (quoting In re Polk, 90 N.J. 550, 578 (1982)). "The threshold of 'shocking' the court's sense of fairness is a difficult one, not met whenever the court would have reached a different result." Id. at 29.

Applying these principles, we discern no basis for disturbing the Commission's well-reasoned determination that Villanueva should be removed from employment as a police officer after he violated the UF policy by deploying OC spray against a detainee who was secured in a detention cell. We therefore affirm the Commission's final administrative decision substantially for the reasons expressed by the Commission, which incorporated the detailed findings of fact and conclusions of law rendered by ALJ Masin in his comprehensive written opinion. We add the following comments.

As ALJ Masin found, Villanueva used mechanical force against Q.S., who no longer posed any danger to Villanueva, the aide, or other detainees because he was in custody. Villanueva's actions clearly violated the UF policy and he submitted a false report in an attempt to hide his violations from his superiors. Therefore, the Commission's decision to impose the penalty of removal is certainly not "so disproportionate to the offense, in light of all of the circumstances, as to be shocking to one's sense of fairness." Herrmann, 192 N.J. at 28-29.

Villanueva's contentions to the contrary lack merit. Villanueva complains that the Department did not adequately investigate the charges against him and did not prepare an internal affairs report concerning them. However, Villanueva does not identify any exculpatory information that would have been uncovered if the investigation had been conducted in a manner to his liking. Thus, there is no evidence in the record to support Villanueva's claim that the Department's pre-hearing investigation was deficient.

Villanueva next argues that the ALJ erred by not granting his request for an adverse inference that his original false report was corrected to Sergeant Acosta's satisfaction. As noted above, Sergeant Acosta had no recollection of the meeting where Villanueva alleged this discussion occurred. Because of this,

Villanueva testified that the City had a duty to call Officer Smith, who Villanueva asserted was present at the meeting, as a witness. Because the City failed to do so, Villanueva asserts that ALJ Masin should have inferred that Officer Smith would have confirmed Villanueva's account of the meeting. This argument lacks merit.

"Generally, failure of a party to produce before a trial tribunal proof which, it appears, would serve to elucidate the facts in issue, raises a natural inference that the party so failing fears exposure of those facts would be unfavorable to him." State v. Clawans 38 N.J. 162, 170 (1962). However, in order for an adverse inference to be applied, the court must find, among other things,

> that the uncalled witness is peculiarly within the control or power of only the one party, or that there is a special relationship between the party and the witness or the party has superior knowledge of the identity of the witness or of the testimony the witness might be expected to give . . . .
>
> [State v. Hill, 199 N.J. 545, 561 (2009) (quoting State v. Hickman, 204 N.J. Super. 409, 414 (App. Div. 1985)).]

Here, Officer Smith was not "peculiarly within the control or power of only the [City]." Ibid. Villanueva could have called Officer Smith as a witness at the hearing. Moreover, Villanueva never established that the officer would

A-4302-18T3

"elucidate relevant and critical facts in issue" or that her testimony would be "superior to that already utilized" in respect to which Villanueva filed a false report. Ibid. Thus, Villanueva was not entitled to the adverse inference he sought. Ibid.

Finally, Villanueva alleges that the Commission did not address the exceptions he filed concerning ALJ's Masin's initial decision before rendering its final administrative decision. We disagree.

Contrary to Villanueva's unsupported contention, the Commission's decision notes that his exceptions were filed with the Commission. The exceptions were therefore part of the record that the Commission stated it considered during its review of ALJ Masin's decision. As permitted by N.J.S.A. 52:14B-10(c) and N.J.A.C. 1:1-18.6(a), the Commission thereafter properly adopted the ALJ's initial decision as its final administrative decision in this matter. As discussed above, ALJ Masin's decision addressed each and every one of the arguments Villanueva raised at the hearing. Therefore, we reject his contention on this point.

All other arguments raised in this appeal, to the extent we have not addressed them, are without sufficient merit to be discussed. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

17

A-4302-18T3