NOT FOR PUBLICATION WITHOUT THE
 APPROVAL OF THE APPELLATE DIVISION
 This opinion shall not "constitute precedent or be binding upon any court."
 Although it is posted on the internet, this opinion is binding only on the
 parties in the case and its use in other cases is limited. R.1:36-3.

 SUPERIOR COURT OF NEW JERSEY
 APPELLATE DIVISION
 DOCKET NOS. A-3609-13T2
 A-5239-13T2

STATE OF NEW JERSEY,

 Plaintiff-Respondent,

v.

MARC GALLUCCI,

 Defendant-Appellant.
________________________________

STATE OF NEW JERSEY,

 Plaintiff-Respondent,

v.

STEPHANIE R. TYLKA,

 Defendant-Appellant.
________________________________

 Argued December 5, 2016 – Decided July 10, 2017

 Before Judges Sabatino, Nugent and Currier.

 On appeal from the Superior Court of New
 Jersey, Law Division, Middlesex County,
 Indictment No. 12-09-1393.

 Lauren S. Michaels, Assistant Deputy Public
 Defender, argued the cause for appellant Marc
 Gallucci (Joseph E. Krakora, Public Defender,
 attorney; Ms. Michaels, of counsel and on the
 brief.)
 Michael A. Priarone, Designated Counsel,
 argued the cause for appellant Stephanie R.
 Tylka (Joseph E. Krakora, Public Defender,
 attorney; Mr. Priarone, on the brief.)

 David M. Liston, Assistant Prosecutor, argued
 the cause for respondents (Andrew C. Carey,
 Middlesex County Prosecutor, attorney; Mr.
 Liston, on the brief.)

PER CURIAM

 A jury found defendants Marc Gallucci and Stephanie R. Tylka

guilty of the aggravated assault of Tylka's former paramour.1 The

trial judge sentenced Gallucci to a five-year prison term and

Tylka to a five-year probationary term. Defendants filed separate

appeals from their respective judgments of conviction.2

 In his appeal, Gallucci contends the trial judge committed

three errors. First, the judge unduly restricted evidence of the

victim's past violent behavior toward Tylka and improperly

instructed the jury on the victim's prior bad acts. Second, the

judge failed to give a Clawans3 charge, sua sponte, concerning two

1
 The jury found another co-defendant, Gallucci's daughter, guilty
of aggravated assault. The jury acquitted a fourth co-defendant.
In this opinion, we refer to Gallucci and Tylka, collectively, as
"defendants"; and Gallucci's daughter and the fourth alleged
participant in the crimes as the "co-defendants."
2
 These two appeals were argued back-to-back. We have consolidated
them for purposes of this opinion.
3
 State v. Clawans, 38 N.J. 162 (1962).

 2 A-3609-13T2
people the State did not call as witnesses. Third, the judge

mishandled an issue with a juror. In addition to these alleged

errors, Gallucci contends the prosecutor committed misconduct in

his summation. Lastly, Gallucci contends the cumulative effect

of the court's and prosecutor's missteps deprived him of a fair

trial.

 Tylka makes the same arguments as Gallucci concerning the

victim's prior violent behavior and the court's alleged

mishandling of an issue involving a juror. She also contends the

trial court erroneously admitted into evidence the content of

certain text messages and a 911 call; failed to give a curative

instruction, sua sponte, when the victim testified she and others

were selling controlled dangerous substances; and improperly

excused a juror. Like Gallucci, Tylka contends the prosecutor

committed misconduct during his summation, and the cumulative

prejudice resulting from the multiple errors deprived her of a

fair trial. Unlike Gallucci, Tylka challenges her sentence as

excessive.

 Following oral argument on appeal, Gallucci filed a motion

to adopt certain arguments Tylka had raised, which he had not. We

granted the motion. In a supplemental brief, Gallucci contends

the State's improper argument in summation concerning Tylka's pre-

 3 A-3609-13T2
arrest silence, to disprove self-defense, violated his right to

due process and a fair trial.

 For the reasons that follow, we affirm the judgments of

conviction in their entirety. We remand for the sole purpose of

correcting a clerical error in Gallucci's judgment of conviction.

 I.

 A.

 In September 2012, defendants and co-defendants were charged

in a Middlesex County grand jury indictment with second-degree

aggravated assault, N.J.S.A. 2C:12-1(b)(1). In the same

indictment, Gallucci was charged with third-degree witness

tampering, N.J.S.A. 2C:28-5(a), and Tylka was charged with fourth-

degree knowingly placing a 911 call without the purpose of

reporting the need for 911 service, N.J.S.A. 2C:33-3(e).

 Tylka filed a pre-trial motion seeking the court's permission

to admit six prior bad acts of domestic violence she alleged the

victim, her ex-boyfriend, had committed against her. Gallucci

joined in the motion, arguing the victim's history of domestic

violence supported his claim of defense of others, namely, Tylka.

The court granted the motions, but cautioned that the prior acts

had to be established at trial by competent evidence and had to

be "short and sweet."

 4 A-3609-13T2
 In December 2013, the case proceeded to trial. Jury selection

began on December 3, and the jury returned its verdict on December

23. The jury found defendants, as well as a co-defendant,

Gallucci's daughter, guilty of the lesser-included offense of

third-degree aggravated assault. The jury found another co-

defendant not guilty. The jury acquitted Gallucci of witness

tampering and Tylka of making an unnecessary 911 call.

 The court sentenced Gallucci to a five-year prison term with

two and one-half years of parole ineligibility and imposed

appropriate penalties and assessments.4 The trial judge sentenced

Tylka to a five-year probationary term conditioned on serving 364

days in county jail, which the court suspended. The court also

imposed appropriate penalties and sanctions. These appeals

followed.

 B.

 The State's proofs included, in addition to the testimony of

law enforcement officers, the testimony of several lay witnesses.

4
 The judgment of conviction states, correctly, that Gallucci was
convicted of aggravated assault, N.J.S.A. 2C:12-1(d)(7), but
incorrectly designates this offense as a crime of the second-
degree instead of the third-degree. See N.J.S.A. 2C:12-1
("[a]ggravated assault . . . under paragraphs (2), (7), (9) and
(10) of subsection b. of this section is a crime of the third-
degree").

 5 A-3609-13T2
The lay witnesses included the victim; the person who hosted the

informal gathering (the hostess) where the assault occurred; the

hostess's upstairs neighbor (the text messenger), who sent text

messages to Tylka; and the hostess's longtime friend, who called

911 and reported the assault.

 The assault occurred on July 4, 2012, shortly before midnight.

The investigation leading to the arrest of defendants continued

past midnight into July 5, 2012. According to the victim, until

shortly before the July 4 incident, he and Tylka had been in a

seven or eight-year relationship. For the six or seven years

preceding the incident, they lived together in an apartment in

South Amboy. During the year preceding the assault, their

relationship deteriorated.

 Sometime in 2011, Tylka obtained a restraining order, which

prohibited the victim from having contact with her. According to

the victim, however, within the week following the issuance of the

order, Tylka told him she "had it dropped." He believed her, so

he moved back into the South Amboy residence. Nonetheless, the

relationship continued to be "on and off" until it ended on July

4, 2012. By "on and off," the victim meant that Tylka would

repeatedly break up with him and then "bring [him] back" shortly

thereafter.

 6 A-3609-13T2
 The victim testified he knew Gallucci and the other co-

defendants because they were friends of his neighbors, who lived

in the same complex. His relationship with Gallucci and the others

had been friendly until shortly before they assaulted him.

 A few weeks before the assault, Tylka told the victim she was

seeing Gallucci. From that point, the victim and Tylka separated,

but the victim continued to live with Tylka as a tenant. Upset

about Tylka seeing Gallucci, the victim had a confrontation with

Gallucci on the evening of July 3, 2012.

 On July 3, upon arriving home from work at approximately 7:00

p.m., the victim found Tylka, Gallucci, and the two co-defendants

in front of his South Amboy residence. They were gathered around

his porch "doing their pills and dealing drugs in front of the

house."5 The victim told Gallucci: "you got to get the f-away

from my house. This can't happen in front of it because it's a

school zone and all this." A heated verbal exchange ensued.

During the exchange, the victim made vulgar remarks about Tylka's

comparative sexual performance with him and Gallucci. The victim

made the remarks within earshot of Gallucci's granddaughter.

5
 None of the defendants objected to the admission of the victim's
remarks. During cross-examination, one co-defendant questioned
the victim about whether he reported the drug activity to the
police.

 7 A-3609-13T2
Gallucci told the victim,, "I'll kick your ass." The victim

replied, "come on, let's go in the back yard." Nothing happened.

Gallucci told the victim, "you're going to get yours." The group

left in Tylka's vehicle.

 The next evening, July 4, the victim returned home from work

at approximately 7:00 p.m., showered, went into town, and bought

two beers and a half-pint of vodka. Later that night, he went to

the residence of the hostess, where she and her friends had

gathered to socialize before watching fireworks. During what the

victim estimated to be an hour or two between his arrival and the

assault, he consumed the two beers and the vodka while sitting on

the hostess's porch. The hostess, her family, and her friends

were socializing. By his own account, the victim was "buzzed" and

intoxicated. According to the hostess, the victim's speech was

noticeably slurred.

 One of the hostess's upstairs neighbors, the text messenger,

was also Tylka's girlfriend. The text messenger spent some time

on or near the hostess's porch with the others. According to the

victim, at one point the text messenger used her phone and then

went upstairs.

 Police recovered texts the text messenger sent to Tylka on

July 4 at 10:54, 11:02, 11:06, and 11:51 p.m. The first stated,

 8 A-3609-13T2
"[the victim is] chilling with [the hostess] downstairs."6 The

last stated, "He all over her on porch. LOL." On July 5 at 12:22

a.m., the text messenger texted Tylka, "Yo, that's X-r-a-z-y girl."

 The victim testified that approximately five minutes after

the text messenger returned upstairs, Tylka's car skidded to a

halt at the curb in front of the residence. Defendants and co-

defendants came "flying out of the car." As they ran toward the

victim, he yelled to the hostess, who had gone inside, to call the

police. The victim claimed that in self-defense he threw a punch

at Gallucci, who was leading the charge. Someone behind the victim

"drop-kicked" him in his lower back and he fell to the ground.

After he fell, the assailants kicked him repeatedly and "beat the

crap" out of him.

 The victim was certain Gallucci's daughter was the person who

"drop-kicked" him. The victim also knew all the defendants were

kicking him because he "could see right around me." He saw

"numerous boots and sneakers" kicking him. Tylka "threw the last

kick." The beating lasted for about five minutes, during which

the victim heard Gallucci say, "Oh you like to say something in

front [of] my granddaughter."

6
 Although the victim's name was misspelled, no one disputed the
texts concerned the victim.

 9 A-3609-13T2
 The beating ended when defendants and co-defendants returned

to the car. The victim was able to spit a mouth full of blood on

the car before they drove off.7 The next thing he recalled was

waking up in the hospital.

 The victim sustained a significant injury as a result of the

beating. He underwent emergency surgery for a right eye laceration

through the eyelid and tear duct. A doctor described in detail

the surgery he performed to repair the lacerations. Although the

doctor opined the lacerations had healed "pretty well," the victim

testified he continued to have follow-up visits with the doctor;

he had pain in his eye "[e]very day"; and he still experienced

headaches. The victim claimed his vision was bad in his right

eye.8

 During extensive cross-examination, defendants and co-

defendants elicited the history of domestic violence involving the

victim and Tylka. The first incident occurred on September 20,

2009, when the victim and Tylka argued and police were called to

7
 The victim testified the distance from the hostess's front porch
to the street was approximately five feet.
8
 Photographs were taken "all around [the victim's] head, his
multiple injuries," and "his chest area where he had some big
bruising." There was also bruising on both sides of the victim's
abdomen as well as scrapes and scratches on his hands and knees.

 10 A-3609-13T2
their residence. Two years later, on September 30, 2011, the

victim was drinking, shoved a curio cabinet, and broke some glass.

Tylka filed a complaint. Ultimately, a final restraining order

(FRO) was issued against the victim, an order that remained in

effect through the July 4, 2012 assault. The victim violated the

FRO. While in the county jail, he wrote a letter to a neighbor

and asked the neighbor to give the letter's second page to Tylka.

In the letter, he told Tylka, "I don't care what you said to police

that I said, 'better watch your back.' It's your ass, . . . you

know I did not say that." By writing the letter to Tylka, the

victim violated the FRO and served time in jail for the violation.

 Less than two months after the July 4, 2012 assault, the

victim was again charged with violating the restraining order.

Lastly, on January 17, 2013, the victim telephoned Tylka, "not

knowing it was her number," and said, "we're on the way. The boys

are on the way."

 Tylka attempted to elicit from various witnesses information

about domestic violence incidents involving her and the victim.

Through cross-examination of a State's witness, South Amboy police

officer James Charmello, Tylka established the officer responded

to a report of domestic violence on April 23, 2012. Officer

Charmello testified the incident stemmed from an argument between

 11 A-3609-13T2
the victim and Tylka. Officer Charmello also testified that when

the April 2012 incident occurred, there was an active temporary

restraining order (TRO) against the victim.

 When Tylka's attorney asked Officer Charmello to read the

basis for the TRO, the court sustained an objection. Defense

counsel could not articulate an evidentiary basis for having the

officer read the hearsay contained in the TRO. He argued, "I

think the jury's entitled to know what the basis is." He also

said the officer was "a gentleman who prepares these all the time";

even though the officer had not personally prepared the TRO at

issue. When the court sustained the prosecutor's objection to

defense counsel eliciting the hearsay information from Officer

Charmello, defense counsel did not respond by citing to a rule of

evidence. Rather, he continued to insist the jury was "entitled

to know why it was issued."

 The attorney later apologized to the court: "Judge, . . . I

apologize about before. I realize that . . . witness was not the

proper witness to discuss . . . the restraining order with. I

subpoenaed those witnesses." During the ensuing colloquy, defense

counsel again apologized: "I am apologizing, Judge, because I

didn't bring it in through the proper witness." Counsel apologized

a third time: "I just wanted to say, . . . I apologize. It was

 12 A-3609-13T2
not the right witness. When the right witness comes, we'll deal

with it."9

 The hostess testified for the State. Although the assault

took place in front of her residence, she did not see how it

started because she had gone into her house. Her longtime friend,

the 911 caller, walked out of the house, and the hostess heard her

yell. The hostess walked out and saw the victim on the sidewalk.

One of the assailants was smashing his head into the concrete.

The hostess turned and pushed her children back into the house.

She, too, retreated inside the house, where she remained until the

assailants were gone and the police arrived. During this time,

the hostess's longtime friend called the police. When the hostess

went outside a second time, the victim was lying "longways" at the

bottom of her stairs on the sidewalk. His head was covered in

blood and his face appeared to be damaged.

 The State played the recording of the hostess's longtime

friend's 911 call. The transcript reads:

 Officer: 911, where's your emergency?

 Female: [Gives Address].

 Officer: What is the problem . . .?

9
 In her case in chief, Tylka presented the testimony of two
officers who testified to three incidents involving domestic
violence and the FRO.

 13 A-3609-13T2
 Female: Five guys beating one guy . . .
 they're going to kill him . . . .
 there's blood everywhere. . . you
 gotta send an ambulance.

 Officer: [Announces location], fight in
 progress, [repeats location].

 Female: Oh my God . . .

 Officer: [Repeats address].

 Female: . . . he's dead.

 Officer: [repeats address] three
 individuals on one . . .

 Female: Five . . .

 Officer: [Repeats address]

 Female: Five guys.

 Second Officer: Received.

 . . . .

 Officer: Just relax. Just
 relax, police officers
 will be there in a
 second . . . .

 Female: Yes, the cops are here . . .

 . . . .

 The first officer to arrive was South Amboy Sergeant Richard

Wojaczyk. Three women on the porch pointed to the victim, who was

lying on the ground and appeared to be badly beaten. His face was

 14 A-3609-13T2
starting to swell, his head had numerous open cuts, and his right

eye seemed to be swelling very quickly. The sergeant began

rendering first aid until a first aid squad arrived. The squad

members attended to the victim and drove him to a medical center.

 Sergeant Wojaczyk and other officers learned the identity of

certain suspects as well as the make and model of Tylka's car.

Officers did not find the car at Tylka's residence, but later

located it across the street from Gallucci's daughter's home. The

officers knocked on the daughter's door and rang the bell for

approximately ten to twenty minutes, but no one answered. The

officers knew someone was in the residence because they could see

a silhouette walking back-and-forth in front of a window. They

eventually left the home and the area at approximately 2:00 a.m.

 Tylka called the South Amboy police station at approximately

3:00 a.m. After verifying she had reached South Amboy, she told

Sergeant Wojaczyk, who by then was staffing the desk:

 Before, I noticed some people outside. I have
 a restraining order against [the victim]. . .
 They seemed to look like they had an
 altercation. I got in my car. It was with a
 couple of black guys. I got in my car, I
 left. I went to Sayreville and I had been
 there since. I want to go home now and I want
 to make sure I don't have any problems . . .

 15 A-3609-13T2
Tylka also told the sergeant she heard the victim was in the

hospital, and "[the police] are looking for me and I don't know

why." When the sergeant told Tylka to come down and clear things

up, Tylka declined. She said she did not want to get in trouble

for something she did not do and that she intended to get a lawyer.

 Later in the morning of July 5, at approximately 4:18 a.m.,

patrol officers stopped Tylka, who was driving her car, and

arrested her and Gallucci, her passenger. The arresting officers

observed no injuries to either defendant. Following her arrest,

Tylka consented to a police search of her car. The officers took

samples of blood splatter from different locations on the vehicle.

An officer swabbed the victim's cheek for DNA evidence. The State

established through forensic evidence and expert testimony that

the blood splatter came from the victim.

 Tylka called two witnesses in her defense: the officers who

responded to her complaints of domestic violence on September 30,

2011, August 13, 2012, and January 18, 2013. The officers

testified to the details of their involvement, according to their

incident reports.

 Following the foregoing testimony, the court inquired as to

whether Tylka would testify. Her attorney said he first needed

an advance ruling. Tylka intended to testify about the domestic

 16 A-3609-13T2
violence incident that led to the restraining order, but not about

the assault. For that reason, her attorney made an application

to bar any reference or cross-examination to her statements

regarding the assault because she would not be testifying as to

those events. Specifically, defense counsel informed the court:

"Now if you limited cross just to that very narrow direct, you

know, I'd like to get a ruling on that. If you're going to open

it up to everything, then I know how to advise my client."

 An exchange followed between the court and defense counsel

about the basis of the court's previous ruling during Officer

Charmello's testimony. Nonetheless, in reply to counsel's

inquiry, the court stated: "So if you want to get into this, I am

opening up cross-examination because this is what you are trying

to do, you are trying to sneak this in." Counsel objected to the

characterization. After an additional exchange, the court said,

"the answer is no. [I]f she testifies, that's opened to

everything." Counsel thanked the court, stating, "that's what I

wanted to clarify."

 Neither Tylka, Gallucci's daughter, nor Gallucci testified.

The fourth co-defendant testified and denied he was present during

the assault. He claimed he stayed home that night. The jury

found him not guilty. As previously noted, the jury found

 17 A-3609-13T2
Gallucci, Tylka, and Gallucci's daughter guilty of third-degree

aggravated assault.

 II.

 On appeal, Gallucci raises the following points:

 I. THE TRIAL JUDGE IMPROPERLY PRECLUDED
 DEFENSE COUNSEL FROM OFFERING EVIDENCE THAT
 [THE VICTIM] HAD BEHAVED VIOLENTLY TOWARD
 TYLKA, AND THREATENED TO HARM HER AND ANYONE
 SHE DATED. THE JUDGE'S 404(B) INSTRUCTION WAS
 ALSO INCOMPLETE.

 II. THE TRIAL COURT ERRED BY NOT ISSUING A
 CLAWANS INSTRUCTION AFTER THE STATE FAILED TO
 CALL EYEWITNESSES [THE TEXT MESSENGER AND THE
 911 CALLER] TO TESTIFY AT TRIAL. (Not Raised
 Below).

 III. THE PROSECUTOR IMPROPERLY BOLSTERED [THE
 911 CALLER'S] 911 CALL BY TELLING THE JURY IN
 SUMMATION THAT PRESENT-SENSE IMPRESSIONS AND
 EXCITED UTTERANCES ARE MORE RELIABLE, AND ALSO
 CAPITALIZED ON THE COURT’S FAULTY 404(B)
 RULING TO ARGUE THAT THERE WAS NO EVIDENCE
 THAT [THE VICTIM] HAD PHYSICALLY ABUSED TYLKA.
 (NOT RAISED BELOW).

 a. The prosecutor's discussion in
 summation regarding the reliability of
 present-sense impressions and excited
 utterances improperly bolstered [the 911
 caller's] 911 call.

 b. the prosecutor misled the jury by
 arguing that there was not prior violence
 between [the victim] and Tylka, contrary
 to evidence that was excluded at trial.

 c. the prosecutorial misconduct was
 plain error.

 18 A-3609-13T2
 IV. THE TRIAL COURT ERRED IN FAILING TO VOIR
 DIRE, OR EVEN ADMONISH, THE JURORS WHO
 VIOLATED THEIR OATH BY DISCLOSING
 DELIBERATIONS AND BULLYING JUROR NO. 1, AND
 IN FAILING TO INSTRUCT THE JURY THAT JUROR NO.
 1 WAS NOT REQUIRED TO CHANGE HIS MIND IN ORDER
 TO ACHIEVE UNANIMITY. THIS ERROR WAS
 COMPOUNDED BY THE JUDGE REPEATEDLY QUESTIONING
 ONLY JUROR NO. 1 ABOUT HIS ABILITY TO BE FAIR
 AND IMPARTIAL, AND INSTRUCTING HIM TO
 "COMPARTMENTALIZE" HIS LIFE EXPERIENCE.
 (PARTIALLY RAISED BELOW).

 V. THE CUMULATIVE EFFECT OF THE
 AFOREMENTIONED ERRORS DENIED GALLUCCI A FAIR
 TRIAL.

Tylka raises these points:

 I. THE TRIAL COURT ERRED IN ADMITTING [THE
 911 CALLER] 911 CALL AND [THE TEXT
 MESSENGER'S] TEXT MESSAGES INTO EVIDENCE OVER
 DEFENDANT'S OBJECTIONS THAT THE 911 CALL AND
 MS. WYATT'S TEXT MESSAGES WERE HEARSAY
 STATEMENTS WHICH DEFENDANT WAS UNABLE TO
 SUBJECT TO CROSS-EXAMINATION BECAUSE [THE 911
 CALLER] AND [THE TEXT MESSENGER] DID NOT
 TESTIFY AT TRIAL.

 II. THE ASSISTANT PROSECUTOR IMPROPERLY
 COMMENTED ON MS. TYLKA'S SILENCE ON THE ISSUE
 OF SELF DEFENSE IN HER 911 CALL TO POLICE ON
 THE NIGHT OF HER ARREST.

 III. THE TRIAL COURT ERRED IN CIRCUMSCRIBING
 DEFENDANT'S PROOFS OF [THE VICTIM'S] VIOLENT
 PROPENSITIES AND THE ASSISTANT PROSECUTOR TOOK
 IMPROPER ADVANTAGE OF THE ERROR BY SUGGESTING
 IN SUMMATION THAT THERE WAS NO EVIDENCE THAT
 [THE VICTIM] WAS ABUSIVE AND VIOLENT TOWARDS
 MS. TYLKA.

 19 A-3609-13T2
 IV. THE TRIAL COURT IMPROPERLY INSTRUCTED AN
 INDIVIDUAL JUROR REGARDING ISSUES RAISED IN
 DELIBERATION AND INSTRUCTED HIM TO
 "COMPARTMENTALIZE" HIS LIFE EXPERIENCE AND
 INCORRECTLY INSTRUCTED THE ENTIRE JURY ON
 THEIR FURTHER DELIBERATIONS. (NOT RAISED
 BELOW).

 V. THE TRIAL COURT ERRED IN FAILING TO
 INSTRUCT THE JURY TO DISREGARD [THE VICTIM'S]
 TESTIMONY THAT MS. TYLKA HAD BEEN SELLING
 PILLS IN A SCHOOL ZONE. (NOT RAISED BELOW).

 VI. THE TRIAL COURT'S ERRONEOUS EXCUSAL OF
 [A] JUROR . . . DENIED DEFENDANT HER RIGHT TO
 TRIAL BY AN IMPARTIAL JURY AND REQUIRES THAT
 DEFENDANT BE ACCORDED A NEW TRIAL.

 VII. CUMULATIVE ERROR DEPRIVED DEFENDANT OF A
 FAIR TRIAL AND REQUIRES THAT DEFENDANT'S
 CONVICTION AND SENTENCE BE REVERSED.

 VIII. DEFENDANT'S SENTENCE TO FIVE YEARS
 PROBATION WITH A SUSPENDED TERM OF 364 DAYS
 IN THE COUNTY JAIL WAS EXCESSIVE AND BASED ON
 THE COURT'S ERRONEOUS REJECTION OF FACTOR 8
 (CIRCUMSTANCES UNLIKELY TO RECUR) AND
 UNSUPPORTED FINDING OF AGGRAVATING FACTOR 6
 (EXTENT OF DEFENDANT'S PRIOR RECORD).

 We begin our discussion with defendants' contentions

concerning the victim's prior bad acts. Gallucci contends in his

first point, and Tylka in her third, that the trial court precluded

defendants from offering certain evidence the victim had behaved

violently toward Tylka, and unduly circumscribed the presentation

of other such evidence. Gallucci adds that the trial court's

instruction concerning the victim's prior bad acts was incomplete.

 20 A-3609-13T2
Tylka adds that the prosecutor improperly commented in summation

that there was no evidence the victim was abusive and violent

towards Tylka. We find no merit in these arguments.

 "[A] trial court's evidentiary rulings are 'entitled to

deference absent a showing of an abuse of discretion, i.e., there

has been a clear error of judgment.'" State v. Brown, 170 N.J.

138, 147 (2001) (quoting State v. Marrero, 148 N.J. 469, 484

(1997)). Here, defendants' contentions have no factual support.

Defendants cite the attempt to elicit the contents of a TRO through

Officer Charmello as support for their argument. They overlook

the reason the court sustained the State's objection as well as

defense counsel's own acknowledgment he attempted to elicit the

testimony through an improper witness. Later, Tylka presented the

testimony of two police officers who related what Tylka told them

about certain domestic violence incidents.

 Gallucci's contention the court unduly restricted Tylka from

testifying about prior acts of domestic violence is entirely devoid

of merit. Tylka wanted to testify about prior acts of domestic

violence but avoid cross-examination about the incident. Her

attorney asked the court for a preliminary ruling on the issue.

Although the trial court made some statements about Tylka's motive

and intent in requesting the ruling, the court ultimately ruled

 21 A-3609-13T2
Tylka would be subject to cross-examination on the assault. She

declined to testify.

 Tylka's dilemma was understandable, but not one calling for

judicial relief. "It is generally accepted that one who provokes

or initiates an assault cannot escape criminal liability by

invoking self-defense as a defense to a prosecution arising from

the injury done to another. The right to self-defense is only

available to one who is without fault." State v. Rivers, 252 N.J.

Super. 142, 149 (App. Div. 1991) (citation omitted). It would

have conceivably been difficult for Tylka to explain how she acted

in self-defense when she, Gallucci, and others decided, near

midnight, to drive to the hostess's residence where they had not

been invited, exit the car, charge the victim, and pummel him so

severely he required hospitalization and surgery. In any event,

the record reflects that Tylka declined to testify after the court

ruled she would be subject to cross-examination about the assault.

The trial court did not abuse its discretion in so ruling. State

v. Weaver, 219 N.J. 131, 149 (2014).

 We also find unavailing Gallucci's argument that the trial

court's instruction to the jury concerning the domestic violence

incidents was incomplete. Defendants approved both the content

and placement of the instruction before it was given, and neither

 22 A-3609-13T2
defendant objected to the instruction after it was given. 10 We

find no error in the court's instruction.

 Lastly, we reject defendants' arguments that the prosecutor

misled the jury by arguing there was no prior violence between the

victim and Tylka, "contrary to evidence that was excluded at

trial." Defendants offered no competent evidence at trial that

the victim had repeatedly assaulted Tylka. When Tylka declined

to testify, she made no specific proffer of the details of her

proposed testimony. Thus, contrary to defendants' assertions,

there was no undisputed, excluded evidence that the victim had

physically abused Tylka.

 Moreover, in his closing remarks, Tylka's attorney told the

jury, "[the victim] is a guy that Marc Gallucci knows wants to

fight him. [Marc] knows that [the victim] likes to beat up

Stephanie Tylka. Marc knows these two facts and that's what makes

it reasonable for him to use force." No evidence presented during

the lengthy trial established directly or by reasonable inference

either that the victim liked to beat up Tylka or that Gallucci

10
 We also note, as to Gallucci, our Supreme Court's caution that
"[o]nly when the defendant has actual knowledge of the specific
acts to which a witness testifies is specific-acts testimony
probative of the defendant's reasonable belief." State v.
Jenewicz, 193 N.J. 440, 463 (2008) (citation omitted).

 23 A-3609-13T2
knew the victim liked to beat up Tylka. The prosecutor's pointing

out that no evidence established that the victim had been

physically violent was a fair comment in light of defense

misconduct in asserting facts having no basis in the record.

 III.

 A.

 In Tylka's first point, she argues the trial court committed

reversible error by admitting the content of the hostess's longtime

friend's 911 call to the police, and by admitting the content of

the text messages the text messenger sent to her. In his third

point, Gallucci argues the prosecutor's closing remarks

emphasizing the reliability of present sense impressions and

excited utterances improperly bolstered the content of the 911

call.

 Preliminarily, we reject Tylka's contention that introduction

of the 911 calls violated her Sixth Amendment right to confront

witnesses. The principles embodied in the Sixth Amendment's

Confrontation Clause preclude the admission against a defendant

of "[t]estimonial statements of witnesses absent from trial,"

unless "the declarant is unavailable, and only where the defendant

has had a prior opportunity to cross-examine." Crawford v.

Washington, 541 U.S. 36, 59, 124 S. Ct. 1354, 1369, 158 L. Ed. 2d

 24 A-3609-13T2
177, 197 (2004). "Testimonial" statements often include those

made during structured police interrogation. Id. at 69, 124 S.

Ct. at 1374, 158 L. Ed. 2d at 203. Nonetheless:

 Statements are nontestimonial when made in the
 course of police interrogation under
 circumstances objectively indicating that the
 primary purpose of the interrogation is to
 enable police assistance to meet an ongoing
 emergency. They are testimonial when the
 circumstances objectively indicate that there
 is no such ongoing emergency, and that the
 primary purpose of the interrogation is to
 establish or prove past events potentially
 relevant to later criminal prosecution.

 [Davis v. Washington, 547 U.S. 813, 822, 126
 S. Ct. 2266, 2273-74, 165 L. Ed. 2d 224, 237
 (2006).]

 Generally, "at least the initial interrogation conducted in

connection with a 911 call, is ordinarily not designed primarily

to 'establis[h] or prov[e]' some past fact, but to describe current

circumstances requiring police assistance." Id. at 827, 126 S.

Ct. at 2276, 165 L. Ed. 2d at 240 (alterations in original). That

is particularly so when "any reasonable listener would recognize

[the 911 caller] was facing an ongoing emergency." Ibid. If,

when viewed objectively, the nature of the colloquy between the

911 caller and the person called is such "that the elicited

statements [are] necessary to be able to resolve the present

 25 A-3609-13T2
emergency, rather than simply to learn . . . what had happened in

the past," the content of the call is not testimonial. Ibid.

 Such is the case here. Any reasonable listener would

recognize the hostess's longtime friend, who placed the 911 call,

was facing an ongoing emergency. The call's sole purpose was to

describe present facts requiring police assistance, as in Davis.

Moreover, the 911 dispatcher's questions were intended to elicit

information needed to dispatch police to the scene and inform them

of the circumstances. Nothing in the dispatcher's questions

suggests he was asking questions to learn what had happened in the

past to preserve testimony for trial.11

 Similarly, we reject Tylka's contention that the content of

the 911 call was inadmissible under New Jersey's evidence rules.

The trial court did not make a specific ruling as to which hearsay

exception applied to the 911 call. Rather, the trial court

appeared to have been satisfied that the content of the call was

admissible once the recording of the call was authenticated.

11
 Our Supreme Court has interpreted the New Jersey Constitution's
Confrontation Clause, N.J. Const., Art. I, ¶ 10, consistently with
the United States Supreme Court's interpretation of the Sixth
Amendment's Confrontation Clause. State ex rel. A.R., 447 N.J.
Super. 485, 506 n.9 (App. Div. 2016) (citing State v. Roach, 219
N.J. 58, 74 (2014); State v. Cabbell, 207 N.J. 311, 328 n.11
(2011)), certif. granted, ____ N.J. ____ (2017).

 26 A-3609-13T2
Nonetheless, "[w]e are free to affirm the trial court's decision

on grounds different from those relied upon by the trial court."

State v. Heisler, 422 N.J. Super. 399, 416 (App. Div. 2011) (citing

Isko v. Planning Bd. of Livington, 51 N.J. 162, 175 (1968) (noting

"[i]t is a commonplace of appellate review that if the order of

the lower tribunal is valid, the fact that it was predicated upon

an incorrect basis will not stand in the way of its affirmance")).

 The State contends the record establishes the 911 caller's

statement was admissible either as a present sense impression or

an excited utterance. We agree. A present sense impression is

"[a] statement of observation, description or explanation of an

event or condition made while or immediately after the declarant

was perceiving the event or condition and without opportunity to

deliberate or fabricate." N.J.R.E. 803(c)(1). An excited

utterance is "[a] statement relating to a startling event or

condition made while the declarant was under the stress of

excitement caused by the event or condition and without opportunity

to deliberate or fabricate." N.J.R.E. 803(c)(2).

 Here, the hostess's testimony and the content of the 911

statements, which could be heard on the call's recording,

established the elements of both hearsay exceptions. These

 27 A-3609-13T2
exceptions apply "[w]hether or not the declarant is available as

a witness[.]" N.J.R.E. 803(c).

 Tylka argues that the hostess's longtime friend "was no longer

in a position to observe what was occurring" when she made the 911

call. Tylka cites the hostess's testimony that her longtime friend

was in the house when she was talking during the 911 call. That

fact, in and of itself, does not negate the longtime friend's

ability to peer outside at what was going on.

 Tylka further speculates that the hostess's longtime friend

was reciting "events previously observed by or described to her

rather [than] a contemporaneous description of what was

occurring." Nothing in the record, however, supports Tylka's

supposition that the longtime friend was reporting events related

to her by others. To the contrary, the evidence establishes there

was insufficient time for this to have occurred. Moreover, even

if the longtime friend were not reporting events she was

contemporaneously witnessing, the present sense impression hearsay

exception applies when the statement is "of an event or condition

made . . . immediately after the declarant was perceiving the

event or condition and without opportunity to deliberate or

fabricate." N.J.R.E. 803(c)(1). The record amply established the

elements of this hearsay exception.

 28 A-3609-13T2
 Even if the present sense impression hearsay exception is

inapplicable, the hostess's longtime friend's 911 statements were

admissible as an excited utterance. The severe beating of the

victim qualified as a startling event and it is readily apparent

from the content of the 911 recorded statements that the longtime

friend remained under the excitement caused by the beating. The

hostess's testimony made clear her friend placed the 911 call

without opportunity to deliberate or fabricate. Defendants

offered no evidence to the contrary.

 Gallucci argues in his third point that the prosecutor engaged

in misconduct when he emphasized in summation the reliability of

present sense impressions and excited utterances. The prosecutor

stated:

 Now this 911 call - - we beat a path to sidebar
 many times during this. A lot of the
 objections that were made were hearsay
 objections and a lot of those were sustained.
 A 911 call actually is an exception to the -
 - it can be played as an exception to the
 hearsay rule, a present sense impression, and
 what that means is that this information being
 provided by the police contemporaneous with
 the incident. There's no time that would
 allow somebody to fabricate, to think about
 what was going on and - - and maybe say
 something that wasn't true. And when you
 listen to this one call, when you hear the
 emotion in the woman's voice who’s talking to
 the police, you can tell that this is ongoing
 at the time that she's speaking to the police.

 29 A-3609-13T2
 Okay? She's not feigning her - - her horror
 as to what happens here. In fact a number of
 times she says, he's dead, they're going to
 kill him.

 Immediately after making these comments, the prosecutor

emphasized the 911 caller had identified herself and then made

statements during the call entirely consistent with the victim's

version of how the assailants attacked him.

 Although we find no impropriety in the prosecutor emphasizing

that present sense impressions and excited utterances are

reliable, the prosecutor's explanation to the jury of hearsay and

the basis for the court's admitting the statements was

inappropriate. The prosecutor is entitled to wide latitude in his

summation provided "he stays within the evidence and the legitimate

inferences therefrom[.]" State v. Wakefield, 190 N.J. 397, 457

(2007) (citations omitted). Objections made during trial, sidebar

discussions, and the basis of a court's rulings are not evidence.

The prosecutor had no business commenting on such legal matters

in summation, particularly the basis of the trial court's rulings

on evidence. Such comments tend to suggest the evidence should

perhaps be given greater weight than other evidence in view of the

trial court's sanctioning its admissibility.

 30 A-3609-13T2
 Nonetheless, the prosecutor's remarks in this case were not

"so egregious that [they] deprived . . . defendant of a fair

trial[.]" State v. Smith, 212 N.J. 365, 404 (2012) (quoting State

v. Frost, 158 N.J. 76, 83 (1999)). The fleeting remarks were made

during the course of a lengthy trial. Defendants lodged no

objection to the remarks. Such an omission generally signifies

that the remarks were not prejudicial. State v. Ramseur, 106 N.J.

123, 323 (1987), cert. denied, sub nom., Ramseur v. Beyer, 508

U.S. 947, 113 S. Ct. 2433, 124 L. Ed. 2d 653 (1993). Moreover,

in its charge to the jury, the court instructed that its rulings

on the admissibility of evidence were not evidence, an expression

of the merits of the case, or an indication evidence should be

accepted by the jury. In addition, the court instructed the jury

the comments the attorneys made in their closing arguments were

not evidence. Considering all these circumstances, we cannot

conclude the prosecutor's improper remarks "substantially

prejudiced defendant's fundamental right to have a jury fairly

evaluate the merits of his defense." State v. Smith, 167 N.J.

158, 181-82 (2001).

 B.

 We are also unpersuaded by Tylka's argument concerning the

text messages. The text messages were not testimonial and did not

 31 A-3609-13T2
violate the Sixth Amendment's Confrontation Clause. "Statements

made to someone who is not principally charged with uncovering and

prosecuting criminal behavior are significantly less likely to be

testimonial than statements given to law enforcement officers."

Ohio v. Clark, ____ U.S. ____, ____, 135 S. Ct. 2173, 2182, 192

L. Ed. 2d 306, 317 (2015). Moreover, the text messages were not

hearsay because they were not "offered in evidence to prove the

truth of the matter asserted[,]" N.J.R.E. 801(c), but rather to

show how defendants knew where the victim was located, and perhaps

what prompted their actions.

 Tylka argues the text messenger's opinion that Tylka had done

something "X r a z y" left the jury to speculate about the

messenger's intention in sending the message. Additionally, Tylka

contends the assistant prosecutor's argument concerning the last

text suggested it was substantive evidence of her guilt.

 The text messenger's intention in sending the sixth text had

little, if any, probative value. To the extent the text could be

interpreted to demonstrate, substantively, Tylka's presence and

participation in the assault, its admission was harmless. R.

2:10-2. Those facts were established by independent evidence and

Tylka never denied them. Rather, she asserted self-defense. In

 32 A-3609-13T2
view of these considerations, her argument the sixth text message

was unduly prejudicial is meritless.

 IV.

 Tylka next contends "the assistant prosecutor improperly

commented on [her] silence on the issue of self[-]defense in her

911 call to police on the night of her arrest." Tylka asserts

"[h]er call was not an attempt to give an account of what occurred,

[rather,] she was seeking clarification of whether or not she was

wanted for questioning."

 Tylka's argument takes the prosecutor's remarks out of

context, mischaracterizes his summation as a comment on her

silence, and misstates that her call was not an attempt to give

an account of what occurred, but rather an attempt to clarify

whether she was wanted for questioning.

 It is true the prosecutor commented on Tylka's failure to

mention self-defense during the 911 call. The prosecutor said,

among other things:

 The funny thing is, we don't hear that in this
 phone call. We don't hear anything about
 self[-]defense in this phone call. We hear a
 denial of any involvement at all. And this
 isn't the police questioning her. This is a
 phone call made to the police. This is
 initiated by Ms. Tylka. This is of her own
 accord and that is what she tells the police.
 . . . [a]nd then she goes on, before I noticed

 33 A-3609-13T2
 some people outside, I have a restraining
 order against [the victim]. They seem to look
 like they had an altercation, I got in my car,
 it was with a couple of black guys, I got in
 my car and left, I went to Sayreville and I've
 been there since, I want to go home now and I
 want to make sure I don't have any problems.

 [(Emphasis added)].

 After emphasizing that defendants claimed they acted in self-

defense and the victim was the aggressor, the prosecutor continued:

 But this is what she said. It seemed to look
 like they had an altercation. Right? Not
 her. Seemingly she's throwing in [the victim]
 because she talks about the restraining order
 against [him], but, you know, in this way that
 it reads, the only conclusion that you can
 reasonably draw listening to this – and,
 again, you don't have to accept – you have it
 to listen to yourselves. But the only
 conclusion that you can draw from this is that
 . . . Ms. Tylka was reporting to the police
 four hours after the incident and [the victim]
 had an altercation with two black guys. I
 would suggest that is very inconsistent with
 the claim of self[-]defense, that is, you need
 to defend yourself, if you need to use force
 against someone else and someone else is using
 unlawful force, you are, in a sense, a victim,
 and if you had the right and the need to use
 self[-]defense, you would proclaim as loudly
 as possible[.]

 In Anderson v. Charles, 447 U.S. 404, 405-06, 100 S. Ct.

2180, 2180-81, 65 L. Ed. 2d 222, 224-25 (1980), at trial, the

prosecutor cross-examined the defendant with a prior inconsistent

statement. The Court held that the prohibition against cross-

 34 A-3609-13T2
examining a defendant on post-Miranda12 silence "does not apply to

cross-examination that merely inquires into prior inconsistent

statements." Id. at 408, 100 S. Ct. at 2182, 65 L. Ed. 2d at 226.

The Court determined the cross-examination "ma[de] no unfair use

of silence, because a defendant who voluntarily speaks after

receiving Miranda warnings has not been induced to remain silent.

As to the subject matter of the statements, the defendant has not

remained silent at all." Ibid. (citations omitted). Explaining

that "two inconsistent descriptions of events may be said to

involve 'silence' insofar as it omits facts included in the other

version[,]" the Court declined to adopt such a "formalistic

understanding of 'silence[.]'" Id. at 409, 100 S. Ct. at 2182,

65 L. Ed. 2d at 227.

 In State v. Tucker, 190 N.J. 183, 189 (2007), our Supreme

Court stated, "[w]e are in accord with the reasoning in Anderson.

A defendant's right to remain silent is not violated when the

State cross-examines a defendant on differences between a post-

Miranda statement and testimony at trial." Our Supreme Court

explained:

 [w]hen a defendant agrees to give a statement,
 he or she does not remain silent, but has

12
 Miranda v. Arizona, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d
694 (1966).

 35 A-3609-13T2
 spoken. Thus, we conclude that it is not an
 infringement of a defendant's right to remain
 silent for the State to point out differences
 in the defendant's testimony at trial and his
 or her statements that were freely given.

 [Ibid. (citations omitted).]

 In Tucker, though defendant neither testified nor presented

witnesses, the Court found the fact the defendant did not testify

inconsequential.

 Although the present case does not
 involve inconsistencies between a statement
 and defendant's testimony at trial, it does
 involve inconsistencies in several statements
 that were freely given and admitted into
 evidence. We find no meaningful distinction
 between the two situations that would justify
 a different result. In both instances, a
 defendant has waived the right to remain
 silent and freely spoken.

 [Id. at 190.]

 Here, the prosecutor did not comment on Tylka's silence.

Rather, he commented on a statement in which Tylka blamed the

victim's beating on two black men. We find no legally significant

distinction between this situation and that in Tucker. By

commenting on a statement Tylka volunteered to police during a

 36 A-3609-13T2
telephone call she initiated, the prosecutor did not violate

Tylka's right to remain silent.13

 V.

 Defendants next contend – in their respective fourth points

— the court mishandled a situation involving a juror. During

deliberations, the jury sent the following note regarding Juror

No. 1:

 Please discuss with Juror [No. 1]. He
 has a personal experience of being assaulted
 by a group of individuals and feels [the
 victim] got what he desires [sic]. [Juror No.
 1] also has members of his family with a
 history of drinking. We think that [Juror No.
 1] was not honest with you during the initial
 jury interview. We are requesting the
 alternate juror.

 Following a discussion with counsel, in which defendants'

attorneys said they preferred the jurors continue deliberating,

the court conducted the following colloquy with Juror No. 1:

 The Court: What happened is . . . we
 received a note from one of the jurors that
 indicated that there's some stuff that went
 on in your background that might be impacting
 in some way, and I don't know, you know, when
 you're deliberating. Okay. So my question
 to you is really kind of simple. Can you be
 fair? Can you be objective in deciding the
 case.

13
 For the same reason, we find Gallucci's supplemental argument
— the State's improper comment on Tylka's silence violated his
right to due process — to be without merit.

 37 A-3609-13T2
 Juror No. 1: Absolutely. Sure.

 The Court: Can you put aside any personal
 experiences that might in any way impact on
 this case, and decide the case based upon the
 facts and the law as [the trial judge] has
 given you?14 Can you do that?

 Juror No. 1: Yes. But life experiences
 played a part in decision making.

 The Court: [A]bsolutely. But what you
 have to do is compartmentalize . . . and say
 here's the law. And [the trial judge] has
 given it to you. Here's the facts. We don't
 have any set of facts that . . . talk about,
 for lack of a better way of putting it so, you
 know, somebody deserving anything, or somebody
 putting them self in a bad position. The issue
 is simply put, if there's self-defense, great.
 You look at the law. If there's not, that's
 also fine. You look at the law. And if you
 have any questions, Judge Mulvihill has sent
 in instructions on the law. Right?

 Juror No. 1: Uh-huh.

 The Court: And regardless of your
 personal feelings, follow the law and apply
 the law to the facts as you find those facts
 to be. A simple question. Can you do it?

 Juror No. 1: Can I? Yes. But two
 reasonable people equally informed some would
 disagree. And . . . . I'm entitled to my
 opinion - -

 The Court: You are.

14
 The trial judge was temporarily unavailable. Another judge was
sitting in for him during deliberations.

 38 A-3609-13T2
 Juror No. 1: - - as far as the other eleven.
 The Court: You absolutely are. But the
 question is, can you listen to everybody else,
 and don't give up something you believe simply
 to agree with them; I don't want you to do
 that, but listen objectively, and if you
 remain firm in your conviction, then you
 continue believing whatever it is you believe,
 but can you be fair and objective[,] period?

 Juror No. 1: I thought I've been fair and
 objective.

 The Court: Okay. Awesome. Then go
 downstairs. Okay. You know what, why don't
 you go . . . in one of the other rooms. Let
 me ask the lawyers if they have anything that
 they want to ask you?

 Juror No. 1: Sure.

 After excusing Juror No. 1, the court stated it would do the

"read back" the jury had requested and "simply explain to them to

listen to one another and be objective in their analysis and do

no more than that." Before the court was able to address the

jury, Juror No. 1 requested to speak with the judge again. Juror

No. 1 requested that the court replace him with an alternate. The

following colloquy then took place:

 The Court: Listen. Listen. Our jury
 system is such that we expect there to be
 deliberations. And sometimes I will tell you,
 . . . there are heated deliberations. I've
 been in cases where, you know, I've sent a
 sheriff's officer in to say, hey, calm down,
 folks. I mean, the question is, can you be
 fair and objective?

 39 A-3609-13T2
Juror No. 1: That's my problem I am fair and
objective and that . . .

The Court: Well, listen. Listen. If you
can be fair and objective, then I'm going to
ask you to stay. Okay. I cannot permit jurors
to be bullied. I cannot permit jurors to be,
you know, intimidated into not sitting. And
the bottom line is, when everybody comes back,
I'll explain that everybody is entitled to
their opinion and should have their opinion.
All I ask each of you to do, and that includes
you and everybody else, be fair and open-
minded enough so if what somebody says makes
sense to you, well, then take it as something
that makes sense. And if it alters your
opinion, great. If it doesn't, then that's
also fine.

Juror No. 1: Right.

The Court: And you'll notice I'm doing
nothing about - - and I'm not - - not talking
about deliberations. I'm not telling you
whether anybody is right or wrong. All I want
is a fair, open-minded discussion. And if you
folks can't agree, I'm good with that.

Juror No. 1: I would feel more comfortable
if the alternate would take my spot.

The Court: Well, I can't release you
simply because you feel uncomfortable. Okay.
If you're telling me you can't be fair, you
can't be impartial, I can talk to counsel
about that. But I - -

Juror No. 1: My problem is I would be fair
and impartial.

The Court: Well, - -

 40 A-3609-13T2
 Juror No. 1: That's my problem.

 The Court: I cannot release you at this
 time.

 Juror No. 1: Okay.

 The Court: Okay. I understand the
 difficulty. All I ask you to be is honest and
 open. And, you know, as I said, listen to the
 other folks. And I trust that they will listen
 to you, and you'll be objective in your
 analysis. Okay. I can't ask for anymore.

 Juror No. 1: Right.

 The Court: During the voir dire
 questioning you were asked a number of
 questions, for example. Were you truthful
 during those - -
 Juror No. 1: Yes.

 The Court: - - those answers?

 Juror No. 1: Absolutely.

 The Court: All right. Then - - then I
 don't really see that there's an issue. All
 right. So let me send you downstairs. Don't
 talk about the case. We'll call you back.
 All right?

 When the jury returned for the read back, the judge instructed

the jury it must "be fair and open-minded, be open to other

people's positions, so that each of you can hear the positions of

the others." The court reiterated to the jury to keep an open

mind and to "not advocate[] for a position."

 41 A-3609-13T2
 Gallucci contends for the first time on appeal the trial

court committed several errors: it failed to admonish the jurors

who wrote the note for disclosing information about their

deliberations; it failed to give the entire model jury charge on

further deliberations stating that jurors should not change their

opinion simply to return a unanimous verdict; and it coerced Juror

No. 1 by telling him to compartmentalize his life experiences.

Tylka makes essentially the same arguments. We disagree with the

contentions and with the assertions that these alleged errors

require a new trial.

 First, there is no evidence that after sending the note

concerning Juror No. 1 to the judge, the jurors disclosed anything

further about their deliberations. Gallucci demonstrates no

prejudice resulting from the court's failure to admonish the jury.

 Next, Gallucci's concern that Juror No. 1 may have been

bullied into changing his mind about the verdict – because the

trial court did not instruct the jury as a whole they should not

change their opinions simply to return a unanimous verdict – is

unwarranted speculation. The court emphasized to Juror No. 1 not

only that he was entitled to his opinion, but he was not to "give

up something you believe simply to agree with them; I don't want

you to do that, but listen objectively and if you remain firm in

 42 A-3609-13T2
your conviction then you continue believing whatever it is you

believe." In view of the court's instruction to Juror No. 1, it

is difficult to discern how Juror No. 1 would have been unaware

that he should not vote with the other jurors simply to reach a

verdict.

 Gallucci argues the court erred by telling Juror No. 1 to

compartmentalize his life experience. The argument is without

sufficient merit to warrant discussion. R. 2:11-3(e)(2).

 The trial court was required to balance delicate interests

when the situation arose with Juror No. 1. "Any inquiry to

determine whether a deliberating juror should be removed and

replaced with an alternate must be carefully circumscribed to

protect the confidentiality of jury communications." State v.

Musa, 222 N.J. 554, 568 (2015) (citation omitted). Moreover,

"[t]rial courts do not have unbridled discretion to reconstitute

deliberating juries in the face of a jury crisis. On the contrary,

the removal rule may be used only in limited circumstances." State

v. Hightower, 146 N.J. 239, 253 (1996). "[T]he essence of jury

deliberations is the joint or collective exchange of views among

individual jurors. It is therefore necessary to structure a

process and create an environment so that the mutual or collective

nature of the jury's deliberations is preserved and remains intact

 43 A-3609-13T2
until final determination is reached." State v. Corsaro, 107 N.J.

339, 349 (1987).

 Here, the trial court carefully struck the balance between

these competing considerations. We find no error in the manner

in which the court exercised its discretion.

 VI.

 Defendant Tylka's and defendant Gallucci's remaining

arguments concerning the trial are without sufficient merit to

warrant extended discussion in a written opinion. R. 2:11-3(e)(2).

We add only the following comments.

 In his second point, Gallucci argues the court should have

given a Clawans charge concerning the hostess's longtime friend

and the text messenger, even though none was requested. The

argument is devoid of merit. Because Gallucci did not raise the

issue at trial, the trial court had no opportunity to analyze

whether the charge should have been given. State v. Hill, 199

N.J. 545, 560 (2009). The trial court's involvement is critical.

Id. at 561. For that reason, rarely, if ever, will such an

argument be grounds for reversal on appeal. Moreover, as Hill

instructs, adverse witness instructions are now generally

disfavored. Id. at 566.

 44 A-3609-13T2
 In any event, it is not apparent from the record that either

of the witnesses at issue was available to testify. In fact, the

record suggests otherwise. There was evidence the hostess's

longtime friend, who made the 911 call, was in another state and

severely ill. A co-defendant's attorney, who wanted to have the

text messenger testify, was unable to locate the text messenger.

Considering all these circumstances, the court's not giving, sua

sponte, an adverse inference charge, was not error, let alone

plain error. R. 2:10-2; State v. Macon, 57 N.J. 325, 335-36

(1971).

 In her fifth point, Tylka contends the court should have

instructed the jury, sua sponte, to disregard the victim's comment

that she and others were selling drugs in front of her residence.

The omission, if error, was not plain error. R. 2:10-2. One

defendant cross-examined the victim on the issue, albeit briefly.

Defendant's claims of self-defense and defense of another were

relatively weak, given the strong evidence they were the aggressors

and the extent of the beating. More significantly, the allegation

about dealing drugs involved criminal activity unrelated in any

respect to either the crimes with which defendants were charged

or the defense of self-defense. Thus, we cannot conclude the

omission to give a curative instruction, particularly in the

 45 A-3609-13T2
absence of a request to do so, was clearly capable of producing

an unjust result. Ibid.

 In her sixth point, Tylka contends that during jury selection,

before the jury was sworn, the trial court abused its discretion

by excusing a juror. The court excused the juror for two reasons:

first, the juror volunteered that his grandfather was in-home

hospice, and if he passed, the juror would have to attend the

services. During the sidebar conference in which the juror

disclosed the issue concerning his grandfather, the judge pressed

him on whether he faced an economic hardship because he would not

be paid for overtime. After the court pressed the issue and asked

a leading question, "wouldn't that be like a hardship for you,"

the juror replied, "[y]eah, I guess it would." The court excused

the juror for both reasons.

 We can discern from the record no abuse of the trial court's

sound discretion in dismissing the juror due to his grandfather's

condition. Tylka does not articulate how the court abused its

discretion by excusing the juror due to his grandfather's

condition. We find no such error. State v. Mance, 300 N.J. Super.

37, 55 (App. Div. 1997).

 Although Tylka does not explain how excusing a juror due to

a relative's possible impending death is an abuse of discretion,

 46 A-3609-13T2
she contends the court coerced the juror into saying he had a

financial hardship. We disagree. "When the issue of financial

hardship is brought into focus at an early stage of a criminal

proceeding, the balancing of interests allows greater flexibility

favoring the prospective juror[.]" State v. Williams, 171 N.J.

151, 164-65 (2002) (citations omitted). In any event, given

defendant's inability to articulate any cognizable argument

concerning the trial court's excusing the juror due to his

grandfather's illness, any error in the exercise of the court's

discretion in excusing the juror on the alternate ground was

harmless beyond a reasonable doubt. R. 2:10-2.

 VII.

 In her eighth and final point, Tylka contends her five-year

probationary sentence, with a suspended term of 364 days in the

county jail, is excessive. Our review of the record reveals the

court's findings of aggravating and mitigating factors are

supported by the record, and the court followed the sentencing

guidelines in New Jersey's Code of Criminal Justice. The sentence

does not "shock the judicial conscience" in light of the facts of

the case. State v. Roth, 95 N.J. 334, 364-65 (1984). Accordingly,

we find no basis for reversing the trial court's sentencing

discretion.

 47 A-3609-13T2
 Defendants' convictions and sentences are affirmed. The

matter is remanded to correct Gallucci's judgment of conviction.

 48 A-3609-13T2